STATE of Wisconsin, Plaintiff-Respondent,

v.

Robert Lee ARTIC, Sr.,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2008AP880–CR. Oral argument September 11, 2009.
—Decided July 15, 2010.*

2010 WI 83

(Also reported in 786 N.W.2d 430.)

399

400

401

For the defendant-appellant-petitioner there were briefs filed by *Keith A. Findley, James D. Cooley,* and the *Frank J. Remington Center, University of Wisconsin Law School,* Madison, and oral argument by *Keith A. Findley.*

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *State v. Artic,*

2009 WI App 12, 316 Wis. 2d 133, 762 N.W.2d 436, which affirmed the judgment of the Milwaukee County Circuit Court, Timothy Witkowiak, Judge.

¶ 2. Robert Lee Artic, Sr. (Artic) moved to suppress evidence discovered during a search of his residence on grounds that police obtained the evidence in violation of the Fourth Amendment to the United States Constitution. The circuit court denied the motion, and a jury convicted Artic of one count of maintaining a drug trafficking place[1] and one count of possession with intent to deliver cocaine as party to a crime.[2] Artic brought a postconviction motion alleging that trial counsel was ineffective for failing to preserve the argument that the police manufactured exigent circumstances to enter Artic's house without a warrant and for failing to object to testimony by an officer of observations she made while she was in Artic's back yard. The circuit court denied this motion, finding that even if trial counsel had made those arguments, the court would have rejected them because it was reasonable for the police to believe that evidence was being destroyed.

¶ 3. Artic appealed. The court of appeals unanimously affirmed on the alternative grounds that while exigent circumstances to enter Artic's house did not exist, the search of his upstairs residence was sufficiently attenuated from the illegal entry of the house to purge the taint of that entry.

¶ 4. We are presented with two issues: (1) whether Artic voluntarily gave consent for the police to search his upstairs residence; and (2) whether that

---

[1] Wis. Stat. § 961.42(1) (2005–06). All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[2] Wis. Stat. §§ 961.41(1m)(cm)4. and 939.05.

search was sufficiently attenuated to purge the taint of the illegal entry of Artic's house.

¶ 5. We conclude that Artic voluntarily gave police officers consent to search his residence, namely, the upstairs unit of his house. We also conclude, based on the three-factor attenuation test established in *Brown v. Illinois,* 422 U.S. 590, 603–04 (1975), that the search was sufficiently attenuated to purge the taint of the illegal entry of Artic's house. For these reasons, Artic was not prejudiced by his counsel's failure in the suppression motion to raise the argument that the police created their own exigent circumstances and to object to testimony about observations made illegally from within the curtilage of Artic's house. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND AND PROCEDURAL HISTORY

¶ 6. The relevant facts are as follows. On January 29, 2006, the Milwaukee Police Department was conducting a narcotics investigation in the 3200 block of North 15th Street in Milwaukee, based on information that a person named Rob would pick up a quantity of cocaine at a house on 15th Street and deliver it to a confidential informant. The informant said that he had ordered four and a half ounces of cocaine from Rob for $3,200. He described Rob as a black male, approximately six-foot tall and 280 to 300 pounds, and said that Rob would arrive in a teal colored minivan. According to the informant, Rob would arrive in the minivan, go into the house to retrieve the cocaine, return to the minivan, and wait for the informant. Six narcotics officers were positioned to observe the house at 3206 North 15th Street.

¶ 7. At about 7:45 p.m., a van, which the informant identified as Rob's vehicle, arrived and parked

several houses away from 3206 North 15th Street. Rob, later identified as Robert Artic, Jr., the son of Robert Artic, Sr., exited the vehicle. The informant identified him as the person who would have the drugs. The officers then observed Rob walk in the front door of 3206 North 15th Street. He was in the building for less than five minutes. When Rob returned to the minivan, he was arrested, and officers obtained two baggies of cocaine from the floor of his van.

¶ 8. After arresting Rob, the officers placed him in an undercover police vehicle. They planned to discreetly secure the house, obtain a search warrant for it, and talk to Rob at a different location so that they would not alert anybody to police presence on the block.

¶ 9. Before obtaining a warrant, Detective Mark Wagner and Officer David Lopez went to the front door to perform a "knock and talk" to determine if anybody was in the house. Wagner knocked on the front door for approximately 20 seconds, announcing "Milwaukee Police" in a loud voice. In the process, Wagner noticed that a window was covered with cardboard and that a video camera was pointed toward the front porch.

¶ 10. Meanwhile, Detective Nicole Davila went around to the back of the house to ensure that no one attempted to escape. Davila walked into a fenced-in back yard to a door at the rear of the house.[3] She saw a light on through a small window on the second floor. While Wagner was knocking at the front door, Davila saw the light go off. Davila also heard what sounded like multiple people scurrying up and down the stairs inside the house. On separate occasions she heard a phone in

[3] Although Davila did not testify specifically regarding the fence, it is clear from photographs in the record that she could not have reached the rear door without going within the confines of a chain-link fence surrounding the back yard.

the upstairs unit begin to ring and then stop ringing. She conveyed these observations to Detective Wagner and Officer Lopez, who were at the front of the building, by yelling and utilizing a Nextel police radio.

¶ 11. After Wagner knocked on the door for more than 30 seconds, and upon hearing Davila's reports of movement, the officers decided to force entry into the building. To enter the building, the officers were required to pass through two doors. Lopez forced the outer front door open by kicking it. However, he was unable to force the inner door after numerous attempts. He then broke the window on the door, reached in, and unlocked the inner door from the inside.

¶ 12. After opening the inner door, the officers began to search the first floor of the building. They located a person named Matthew sleeping in a rear bedroom. The first floor appeared to be in the process of renovation. The officers found a dining room that was being renovated, a bedroom that appeared to belong to a female, and a kitchen area that was being remodeled. In the kitchen area they observed drywall, the absence of furniture, exposed plumbing, and a garbage can containing work supplies and tools. Just off this kitchen area was a newly renovated bathroom.

¶ 13. Wagner followed a separate hallway in the back of the first floor that led up to the second floor. At the top of the stairs, he encountered a closed door. Wagner was unsure whether the second floor was a separate unit or part of a single-family residence. Because of his uncertainty, he knocked on the upstairs door and announced "Milwaukee Police." A male voice answered "Just a minute," and shortly afterwards, Artic answered the door. Wagner testified that he had his weapon drawn when he first entered the building, but holstered it either when he was knocking on the up-

stairs door or when Artic answered the door. Artic testified that Wagner had his gun drawn when he answered the door, but holstered it after the police entered the upstairs unit.

¶ 14. Wagner asked if he could come in and talk to Artic; Artic responded yes.[4] Wagner asked if anyone else was in the residence. Artic responded that he had a lady friend in the back room who was not dressed. Wagner asked Artic to ask her to get dressed and come out to the kitchen. The officers waited for the woman, later identified as Winnie Grafton. After Grafton arrived, Wagner began to speak with Artic and Grafton while they were seated at the kitchen table. Wagner asked Artic if he owned the building, and Artic replied that he did. He explained that it was a duplex and that he was converting the entire building into a single-family residence. During the initial conversation with Artic, Wagner was accompanied by only one other officer. Lopez entered the upstairs unit as Artic and Wagner were speaking. Several other officers entered the unit afterwards.

¶ 15. Wagner explained to Artic that his son had just been arrested with a large amount of cocaine. He asked whether Artic believed his son would have left any cocaine in the house because the officers observed him enter and then leave the building. Artic said he did not think his son would do something like that and told the officers it was okay for them to search the residence. Artic stated that he had nothing to hide and wanted to be forward with the police. He also explained to them that he was on supervisory release.

---

[4] Artic does not challenge the voluntariness of the consent he gave the officers to *enter* the upstairs unit, but rather the voluntariness of the consent he gave the officers to *search* the unit.

¶ 16. After gaining oral consent from Artic, Wagner asked if Artic would consent in writing, and he began writing out a consent agreement. Artic stated that he would not sign anything without his lawyer, but reaffirmed that it was okay for the police to search. Wagner testified that he made no promises or threats to Artic in order to gain consent. After Artic refused to sign the form, Wagner and Artic continued to speak about "family and stuff" in the kitchen.

¶ 17. The officers then searched Artic's residence. During the search, they discovered a "California safe" of Gunk Big Puncture seal, which was a fake pressurized can with a screw-off bottom. The can contained coffee grounds and a plastic baggie containing a white residue. The officers also recovered sandwich baggies, latex gloves, a razor blade, a gold metal wire, a gray digital scale, and a shoe box containing suspected cocaine residue. In addition, officers observed white powdery fingerprints on Artic's sweater. The sweater and shoe-box were later sent to the Wisconsin Regional State Crime Lab and tested positive for cocaine residue.

¶ 18. On February 3, 2006, Artic was charged with one count of maintaining a drug trafficking place, contrary to Wis. Stat. § 961.42(1), and one count of possession with intent to deliver cocaine as party to a crime, contrary to Wis. Stat. §§ 961.41(1m)(cm)4. and 939.05. Artic moved to suppress the evidence obtained in the search of the upstairs unit. The circuit court held a suppression hearing at which Artic denied giving Wagner consent to search his unit. The court found that Artic's testimony was not credible, that the officers acted lawfully based on exigent circumstances, and that Artic voluntarily consented to the search. As a result, the court denied the motion to suppress. The case proceeded to a jury trial, and the jury found Artic guilty of both counts.

¶ 19. After his conviction, Artic filed a motion for postconviction relief, alleging, among other claims, that his trial counsel was ineffective for failing to preserve the argument that the police improperly created their own exigent circumstances and for failing to object to Davila's testimony because it was illegally obtained by her presence within the curtilage of Artic's property. The circuit court said that even if trial counsel had made the argument that police created their own exigent circumstances, the court would have rejected it, and that Davila's observations were lawfully made while she was securing the house. Accordingly, the court found trial counsel's actions to be neither deficient nor prejudicial, and denied the motion.

¶ 20. Artic appealed, seeking reversal of the postconviction motion and asking the court of appeals to vacate his conviction. On December 9, 2008, the court of appeals affirmed. The court held that the search of the upper-level unit was sufficiently attenuated from the illegal entry of the house to be lawful. *Artic,* 316 Wis. 2d 133, ¶ 19. It held that there was credible evidence to support the circuit court's finding that Artic consented to the search. *Id.,* ¶ 22. Regarding attenuation, the court applied the three-factor test from *State v. Richter,* 2000 WI 58, ¶¶ 46–54, 235 Wis. 2d 524, 612 N.W.2d 29, and held that: (1) the time between the illegal entry and the search was significant; (2) there were meaningful and significant intervening circumstances; and (3) the police action did not rise to the level of conscious or flagrant misconduct that they sought to exploit. *Artic,* 316 Wis. 2d 133, ¶¶ 25–30. It concluded: "All three attenuation factors favor the conclusion that the consensual search was sufficiently attenuated from the initial illegal entry." *Id.,* ¶ 30.

¶ 21. Artic petitioned this court for review, which we granted on March 2, 2009.

## II. STANDARD OF REVIEW

■

¶ 22. The threshold issue in this case is whether Artic was denied effective assistance of counsel. Ineffective assistance of counsel presents a mixed question of fact and law. *State v. Fonte,* 2005 WI 77, ¶ 11, 281 Wis. 2d 654, 698 N.W.2d 594. We will not overturn the circuit court's findings of fact unless they are clearly erroneous. *Id.* We review de novo whether counsel's performance was deficient and if that performance prejudiced the defendant. *Id.*

■

¶ 23. With respect to the search, voluntariness of consent and attenuation are both questions of constitutional fact. *State v. Phillips,* 218 Wis. 2d 180, 195, 204, 577 N.W.2d 794 (1998). We review questions of constitutional fact as mixed questions of fact and law and apply a two-step standard of review. *State v. Post,* 2007 WI 60, ¶ 8, 301 Wis. 2d 1, 733 N.W.2d 634 (citing *State v. Martwick,* 2000 WI 5, ¶ 16, 231 Wis. 2d 801, 604 N.W.2d 552). We review the circuit court's findings of historical fact to determine if they are clearly erroneous, and we independently apply those facts to constitutional principles. *Id.*

## III. DISCUSSION

■

¶ 24. The issues in this case arise in the context of Artic's ineffective assistance of counsel claim. A defendant seeking reversal based upon ineffective assistance of counsel must prove two components. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). First, he must

prove that his counsel's performance was deficient. *Id.* Second, he must prove that the deficient performance prejudiced his defense. *Id.* This requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 25. It is not necessary to address whether Artic's trial counsel was deficient because Artic was not prejudiced by any alleged deficiencies. We "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. The circuit court would have properly denied the motion to suppress even if Artic's counsel had raised the argument that the police created their own exigent circumstances in the motion to suppress and had objected to Detective Davila's testimony.

¶ 26. In determining whether Artic was prejudiced, we assume that the officers' entry into the house was unconstitutional. Although the officers acted upon their belief that evidence was being destroyed, this belief was based on Davila's observations made from within the curtilage in back of Artic's house. Detective Davila's presence within the curtilage was not lawful. Therefore, the officers' entry into the house based on Davila's observations from within the curtilage was unconstitutional.[5] However, because the officers ulti-

_____

[5] We cannot speculate what Detective Davila might have seen or might have heard had she been standing outside the curtilage.

mately obtained the evidence lawfully, Artic was not prejudiced by his counsel's failure to object to Davila's testimony.

¶ 27. Because the officers' entry into the *house* was unconstitutional, the central question in this case is whether the officers' search of Artic's upstairs *residence* was also unconstitutional. To answer this question, we first address whether Artic's consent to the search of his upstairs residence was voluntary. We then address whether the officers' search of Artic's upstairs residence was sufficiently attenuated from the illegal entry of his house to purge the taint of that entry.

A. Voluntariness of Consent

■

¶ 28. The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Wis. Const. art. I, § 11. This court ordinarily construes the protections of these provisions coextensively. *State v. Johnson,* 2007 WI 32, ¶ 20, 299 Wis. 2d 675, 729 N.W.2d 182.

■

¶ 29. Warrantless searches are per se unreasonable, subject to several clearly delineated exceptions. *State v. Faust,* 2004 WI 99, ¶ 11, 274 Wis. 2d 183, 682 N.W.2d 371. One well-established exception to the warrant requirement is a search conducted pursuant to consent. *Phillips,* 218 Wis. 2d at 196; *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973).

■

¶ 30. To determine if the consent exception is satisfied, we review, first, whether consent was given in fact by words, gestures, or conduct; and, second,

whether the consent given was voluntary. *Phillips,* 218 Wis. 2d at 196–97. The question of whether consent was given in fact is a question of historical fact. We uphold a finding of consent in fact if it is not contrary to the great weight and clear preponderance of the evidence. *Id.*

■

¶ 31. At the suppression hearing, Wagner testified that Artic gave express oral consent to search, while Artic testified that he did not give consent. The circuit court found that Artic gave consent in fact. Based on Wagner's testimony, this finding of fact was not contrary to the great weight and clear preponderance of the evidence. Artic now concedes that the circuit court's finding that consent was given in fact is not clearly erroneous.

■

¶ 32. The second issue is whether the consent given by Artic was voluntary. The State bears the burden of proving that consent was given freely and voluntarily, *Schneckloth,* 412 U.S. at 222, and it must satisfy that burden by clear and convincing evidence, *Phillips,* 218 Wis. 2d at 197. The United States Supreme Court has recognized that voluntary consent cannot be summed up in a "talismanic definition." *Schneckloth,* 412 U.S. at 224. Instead, "voluntariness" reflects an accommodation of complex, somewhat conflicting values. *Id.* at 224–25. Law enforcement officers are expected to investigate possible illegal conduct, but the criminal law under which they operate "cannot be used as an instrument of unfairness." *Id.* at 225. When a suspect is asked to make a statement or consent to a search, the suspect's response must be "an essentially free and unconstrained choice," *id.,* not "the product of

duress or coercion, express or implied," *id.* at 227.[6] The determination of "voluntariness" is a mixed question of fact and law based upon an evaluation of "the totality of all the surrounding circumstances." *Id.* at 226; *State v. Vorburger,* 2002 WI 105, ¶ 88, 255 Wis. 2d 537, 648 N.W.2d 829. Consent is not voluntary if the state proves "no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548–49 (1968).

¶ 33. In considering the totality of the circumstances, we look at the circumstances surrounding the consent and the characteristics of the defendant; no single factor controls. *Phillips,* 218 Wis. 2d at 197–98; *Schneckloth,* 412 U.S. at 226. In *Phillips,* this court considered multiple non-exclusive factors to determine whether consent was given voluntarily: (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent. *Phillips,* 218 Wis. 2d

[6] *See State v. Vorburger,* 2002 WI 105, ¶ 89, 255 Wis. 2d 537, 648 N.W.2d 829 (a reviewing court must determine that the consent was not the result of duress or coercion); *State v. Kiekhefer,* 212 Wis. 2d 460, 471, 569 N.W.2d 316 (Ct. App. 1997) (consent must be the product of a free and unconstrained choice).

at 198–203; *State v. Bermudez,* 221 Wis. 2d 338, 348–51, 585 N.W.2d 628 (Ct. App. 1998). Discussion regarding either the absence of a search warrant or the possibility of getting one bears on several of these factors.

¶ 34. Examining these factors, we conclude that Artic consented to the search freely and voluntarily, in the absence of express or implied duress or coercion. *Phillips,* 218 Wis. 2d at 197–98; *Schneckloth,* 412 U.S. at 226, 248–49.

¶ 35. The first factor we examine is whether the officers used any deception, trickery, or misrepresentation in obtaining consent from Artic. In *Phillips,* the court found this first factor to weigh in favor of voluntariness because "officers disclosed to the defendant almost all of the information they possessed concerning their interest in his home." *Phillips,* 218 Wis. 2d at 198–99. The court noted that the officers acknowledged they did not have a warrant, described their purposes for being in the home, and did not "mask their identities or misrepresent the purpose for being at the defendant's home." *Id.* at 199.

¶ 36. Here, the officers were forthright with Artic about their identities and their reasons for being in the house. Wagner testified that he asked for consent to search only after explaining to Artic that the officers had arrested his son with a large amount of cocaine after observing him enter and leave the residence. Wagner also explained to Artic that the officers did not have a warrant. Artic testified that the officers told him that a person had left the house with drugs, although Artic's testimony at the suppression hearing and his testimony at the jury trial are contradictory as to whether officers identified the person as Artic's son. Artic also acknowledged that the officers did not claim to have a search warrant. Nothing in this testimony

415

suggests deception, trickery, or misrepresentation on the part of the officers. Therefore, this factor weighs in favor of voluntary consent.

¶ 37. The second factor is whether the officers threatened, intimidated, or in any way "punished" Artic. Consent may be involuntary if the officers "deprive the defendant of any necessities, prolong the encounter to wear down the defendant's resistance, or employ any other coercive interrogation tactics" before obtaining consent. *Phillips*, 218 Wis. 2d at 200. There is no evidence in the record that the police used any of these coercive tactics. Wagner specifically testified that he made no promises or threats to Artic.

¶ 38. The two factors bearing on threats or intimidation are Wagner's drawn firearm and Artic's testimony that Officer Lopez told him that if he did not give consent, the officers would get a search warrant or tell Artic's supervised-release officer.

¶ 39. There was mutual apprehension when Artic opened the door to the second-floor unit because Detective Wagner had drawn his weapon. Artic testified that Wagner holstered his weapon after Artic opened his door and gave permission to enter the upstairs unit. The tension inherent in the presence of a police officer with his weapon drawn appears to have dissipated quickly after the weapon was holstered because it was followed by police accommodations and mutual conversation around the kitchen table.

¶ 40. Artic testified that Lopez, in effect, threatened to get a warrant or to tell his supervised-release officer. The circuit court did not make a specific finding that this occurred. However, the court did find that Wagner did not threaten or promise anything to get Artic to give consent.

¶ 41. Even if Lopez did tell Artic the officers would get a warrant, that fact would not support a finding of involuntary consent. Threatening to obtain a search warrant does not vitiate consent if "the expressed intention to obtain a warrant is genuine . . . and not merely a pretext to induce submission." *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992); *State v. Kiekhefer*, 212 Wis. 2d 460, 473, 569 N.W.2d 316 (Ct. App. 1997).

¶ 42. Here, Wagner testified that the officers intended to obtain a search warrant, but decided not to because they obtained consent from Artic. The officers had probable cause to obtain a search warrant based on the fact that Rob was arrested with a substantial amount of cocaine after leaving the house.[7] The police noted suspicious signs at the house, apart from Detective Davila's observations, namely, the video camera facing the front porch and the window covered with cardboard. The failure of anyone to answer their loud knocking and announcement at the door was suspicious once they realized that Artic and Grafton were in the house. Finally, Artic volunteered the fact that he was under supervision. This information could have been verified and made specific if the police had sought a search warrant. Therefore, even if Lopez had told Artic the officers would obtain a search warrant, it was not a

---

[7] Professor LaFave states that "a threat to *obtain* a search warrant is likely to be held to invalidate a subsequent consent if there were not then grounds upon which a warrant could issue, and likely not to affect the validity of the consent if the police then had probable cause upon which a warrant could issue." 4 Wayne R. LaFave, *Search and Seizure*, § 8.2(c), at 73–74 (4th ed. 2004).

"baseless threat." *White,* 979 F.2d at 542. This factor weighs in favor of voluntary consent.

¶ 43. The third factor is whether the conditions at the time of consent were non-threatening and cooperative. In examining this factor, we consider whether the officers and the defendant "were open and forthright during the encounter, each posing questions and providing information." *Phillips,* 218 Wis. 2d at 200. We also examine whether "the police [made] a show of force at the time the consent [was] sought, or if the surroundings [were] coercive in other respects." 4 Wayne R. LaFave, *Search and Seizure,* § 8.2(b), at 61–62 (4th ed. 2004).

¶ 44. The evidence in the record suggests that the conditions at the time of consent were non-threatening and cooperative. The officers knocked on Artic's door and waited for him to answer. They waited for Grafton to get dressed and arrive in the kitchen before they sought consent from Artic.[8] The officers were candid regarding their lack of a search warrant and explained that they wanted to search the residence for drugs Rob may have left there. Artic explained that he wanted to be straightforward with officers, informing them that he was on supervisory release. Artic was not intimidated inasmuch as he asserted his right not to sign a written consent form, but orally gave consent to search, saying he had nothing to hide. Wagner and Artic continued to talk about "family and stuff" after consent was given. All this suggests a congenial tone to the encounter at the time Artic gave consent and that Artic was neither overcome

---

[8] In this respect, this case is analogous to *State v. Bermudez,* 221 Wis. 2d 338, 350, 585 N.W.2d 628 (Ct. App. 1998), in which the court of appeals noted that the officers permitted the babysitter to enter the room to collect food and clothing for the children.

nor intimidated by the police. *See Phillips,* 218 Wis. 2d at 200–01 (holding that the fact that the defendant gave the agents a magazine when they left was "inconsistent with a conclusion that the encounter between the agents and the defendant was coercive or that the defendant's will was in any way overcome by the agents' tactics"). Artic testified at his jury trial that neither he nor the officers were giving each other a "hard time."

¶ 45. Artic relies heavily on the fact that Wagner had his weapon drawn to support the claim of involuntariness. Once again, the record is somewhat unclear regarding the role of weapons in this encounter. At the preliminary hearing, Wagner testified that he put his gun away when Artic answered the door. At the suppression hearing, Wagner testified that he thought he holstered the gun either as he was knocking on the door or when Artic answered the door, and while he could not be completely positive of exactly when, he knew that he had holstered it by the time he was sitting with Artic in the kitchen. Artic testified that Wagner had his gun out when he answered the door, but holstered it after the police came in, before Artic and Wagner had the conversation in which Wagner explained the reasons for the police presence.[9] The circuit court did not make a finding as to when Wagner holstered his gun.

¶ 46. Certainly, voluntary consent is less likely when the defendant "answers the door to find officers with guns drawn." 4 Wayne R. LaFave, *Search and Seizure,* § 8.2(b), at 63 (4th ed. 2004). However, the fact

---

[9] Artic argues in his brief that "[w]hen Artic opened the upstairs door, he saw a gun pointed directly at him." At his suppression hearing, Artic did not testify that Wagner had pointed his weapon at him. At his trial, however, he testified that Wagner pointed his weapon at Artic and then holstered it after walking in.

that an officer has a weapon drawn at the beginning of an encounter does not prevent the situation from evolving into something non-threatening and relatively congenial.

¶ 47. In *United States v. Smith,* 973 F.2d 1374 (8th Cir. 1992), when the defendant's wife opened the door, the officers drew their weapons and told her they were looking for the defendant. *Id.* at 1375. She allowed the officers to come inside, and they observed evidence that they later used to obtain a search warrant. *Id.* The Eighth Circuit upheld the finding that consent was voluntary, noting that "[w]hile the officers did draw their weapons when [the defendant's wife] opened the door, there was no evidence that they immediately demanded entry." *Id.* at 1376. The court also noted that the officers had a brief conversation with her, that she never refused entry, and that no physical force or threats were used. *Id.*

¶ 48. The facts here weigh more strongly in favor of voluntariness than the facts in *Smith.* Wagner had his gun drawn but holstered it before asking Artic for consent to search. Like the officers in *Smith,* he did not demand entry nor use a threat or physical force. Thus, the fact that Wagner had his gun drawn when the door was opened does not outweigh the substantial evidence that the conditions at the time of consent were congenial and non-threatening.

¶ 49. Artic compares the facts here to three cases in which officers had guns drawn and entered by breaking down a door. None of these cases has facts similar to the facts here. In *United States v. Medlin,* 842 F.2d 1194, 1196 (10th Cir. 1988), ATF agents entered the defendant's property executing a federal search warrant but subsequently seized items beyond the scope of the warrant that the ATF deputy believed to be

evidence of state law violations. *Id.* The court noted that the agents' guns were drawn, but emphasized the generally coercive nature of this situation: "As a layperson, under such extreme conditions, Medlin could hardly be expected to distinguish between that part of the search which was authorized by warrant, and for which his consent was unnecessary, and that part of the search which was unauthorized." *Id.* at 1198. The *Medlin* situation is unlike the situation here, where the officers expressly told Artic they lacked a warrant and asked for permission to search.

¶ 50. In *United States v. Jones*, 641 F.2d 425, 429 (6th Cir. 1981), the officers requested that the resident open her door, and when the resident refused, they began to kick the door. The resident allowed the officers in after they began to kick. *Id.* She extended permission to search only after the officers told her they had a "warrant for Earl Jones" without specifying that they had only an arrest warrant, not a warrant to search his home. *Id.*

¶ 51. Again, *Jones* presents a set of facts different from those here, where the officers knocked on the door to Artic's unit, obtained permission to enter, and revealed that they did not have a warrant before requesting consent to search.

¶ 52. Finally, Artic cites *United States v. McIntosh*, 857 F.2d 466 (8th Cir. 1988). Although the facts of that case are not entirely clear, it does not appear that the officers asked for consent to enter the residence. Instead, when the resident opened the door, the officers simply "stepped inside." *Id.* at 467. The court also determined that the resident opened the door "because [the officers] had weapons drawn when they demanded entry." *Id.*

¶ 53. Here, there was no testimony about whether Artic knew the officers had weapons drawn when they initially knocked on the door to his unit.

However, the officers did not "demand entry." The officers waited for Artic when he said "just a minute," and after he answered the door, they requested permission to enter.

¶ 54. Artic also cites *Johnson* as an example of a situation in which consent was not voluntary under more congenial circumstances than these. *Johnson,* however, is inapposite. In *Johnson,* the officer did not ask for consent, as was the case here; rather, he told the defendant that officers "were going to search the vehicle." *Johnson,* 299 Wis. 2d 675, ¶ 19. This court held that the circuit court's finding of consent-in-fact was clearly erroneous. *Id.* The court did not use the factors outlined in *Phillips* to determine whether, under the totality of the circumstances, consent was voluntary.

¶ 55. Here, the circuit court's factual finding that Artic gave consent is not clearly erroneous, and *Johnson* does not affect the question of voluntariness.

■■■

¶ 56. The fourth factor is Artic's response to the request to search. An initial refusal of a request to search will weigh against a finding of voluntariness. *Kiekhefer,* 212 Wis. 2d at 472. Here, Artic initially told the officers that they could search the residence. Although Artic refused to sign a written consent form, he explained that he would not sign anything without his lawyer. He then reaffirmed that, while he would not sign the consent form, he was still permitting the officers to search.

■■■

¶ 57. The fact that Artic refused to provide written consent does not weigh against voluntariness. Consent need not be written to be voluntary, *see Vorburger,* 255 Wis. 2d 537, ¶¶ 97, 99, and refusal to sign a

consent form does not vitiate prior oral consent, *United States v. Lattimore,* 87 F.3d 647, 651 (4th Cir. 1996); *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir. 1988).[10] Because Artic initially gave oral consent and then reaffirmed that consent, this factor weighs in favor of voluntariness.

¶ 58. The record also suggests that Artic gave the officers consent because he believed that incriminating evidence had been eliminated. In weighing voluntariness, some courts have considered "the defendant's belief that no incriminating evidence will be found." *United States v. Simms,* 385 F.3d 1347, 1355 (11th Cir. 2004); *United States v. Jenson,* 462 F.3d 399, 406 (5th Cir. 2006). Artic replied to Wagner's initial request by stating that he wanted to be straightforward with the officers and had "nothing to hide." Artic testified at his jury trial that, as the police were on their way, Grafton was walking into the bathroom with supplies to clean up spilled cocaine. He also testified that he told the officers "just a minute" before answering the door because Grafton was disposing of cocaine. By the time Artic gave consent, Grafton had joined Artic and the officers in the kitchen. The fact that Artic believed Grafton had disposed of the cocaine supports the conclusion that he voluntarily gave consent to search.

¶ 59. The fifth factor looks at the defendant's characteristics, including youth, lack of education, lack of intelligence, physical and emotional condition, and experience with the police. *Schneckloth,* 412 U.S. at 226;

---

[10] "[T]he claim that the subsequent refusal to sign a consent form operates to make the prior oral consent a nullity has been rather summarily rejected by the courts." 4 Wayne R. LaFave, *Search and Seizure,* § 8.2(f), at 99 (4th ed. 2004).

*Phillips,* 218 Wis. 2d at 202. Artic argues that "there is no indication in this record that he was exceptionally intelligent or versed in the law, or that he previously had any experience with searches of his home." A person need not possess exceptional intelligence, legal knowledge, or experience with law enforcement to give voluntary consent. We look to whether there was evidence "suggesting that the defendant was *particularly susceptible* to improper influence, duress, intimidation, or trickery." *Phillips,* 218 Wis. 2d at 202–03 (emphasis added). The record here suggests otherwise. Artic (DOB: 3–6-46) was nearly 60 years old at the time of the search. Although he dropped out of high school, he later obtained his GED. He also previously owned a service station and rental properties. Finally, he had a prior drug conviction and was on extended supervision at the time of the search. Based on these characteristics, this factor weighs in favor of voluntariness.

¶ 60. The sixth factor is whether the officers informed the defendant that he could refuse to consent. While not fatal, this factor weighs against voluntariness. *Schneckloth,* 412 U.S. at 227; *Phillips,* 218 Wis. 2d at 203. This court and the United States Supreme Court have refused to adopt a requirement that officers must advise a person of a right to refuse consent. In *Schneckloth,* the Supreme Court held that "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." *Schneckloth,* 412 U.S. at 231. This court applied *Schneckloth* in *Phillips,* holding that the State is not required to demonstrate whether "the defendant knew . . . he could refuse consent." *Phillips,* 218 Wis. 2d at 203.

¶ 61. There is no evidence in the record that the officers here informed Artic he could withhold consent. Artic did, however, refuse to sign the written consent agreement offered by Wagner, creating a reasonable inference that he was aware he could withhold consent. Accordingly, although this factor weighs against a finding of voluntariness, it does not weigh heavily into our consideration of the totality of the circumstances.

¶ 62. Summing up, we conclude, based on the totality of the circumstances, that Artic freely and voluntarily gave the officers consent to search his unit.

B. Attenuation

■■■

¶ 63. We next address whether the search of Artic's upstairs residence was sufficiently attenuated from the illegal entry of his house to purge the taint of that illegal entry. For this analysis, we assume the court of appeals was correct that warrantless entry of Artic's house was illegal—that none of the clearly delineated exceptions to the warrant requirement apply.

■■■

¶ 64. Evidence does not become "fruit of the poisonous tree" simply because it would not have come to light but for illegal actions by law enforcement. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). When illegal police conduct has been established, the question still remains whether evidence sought to be suppressed was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (quoting Maguire, *Evidence of Guilt*, 221 (1959)).

¶ 65. The purpose of the exclusionary rule is to deter unlawful conduct and to preserve judicial integrity by barring the use of evidence unconstitutionally obtained. *Brown,* 422 U.S. at 599–600. Nonetheless, "the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Id.* at 600 (quoting *United States v. Calandra,* 414 U.S. 338, 348 (1974)). The object of attenuation analysis is "to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Id.* at 609 (Powell, J., concurring).

¶ 66. In *Brown,* the Supreme Court applied the rule from *Wong Sun* to determine whether a *Miranda*[11] warning was sufficient to purge the primary taint of an unlawful arrest. *Brown,* 422 U.S. at 600–01. The Court rejected a per se rule and held that the application of *Wong Sun* "must be answered on the facts of each case." *Id.* at 603. To determine whether the primary taint was purged, the *Brown* Court looked to three factors: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and, particularly, (3) the purpose and flagrancy of the official misconduct. *Id.* at 603–04.

¶ 67. Although *Brown* specifically addressed a confession made after an illegal arrest, this court has applied the *Brown* factors to the context of an illegal search. In *State v. Anderson,* 165 Wis. 2d 441, 477 N.W.2d 277 (1991), the court addressed the admissibility of evidence obtained after two illegal searches and "reaffirm[ed] that the *Brown* analysis is the proper test

---

[11] *Miranda v. Arizona,* 384 U.S. 436 (1966).

to follow in attenuation cases." *Id.* at 447. More recently, the court applied the *Brown* three-factor attenuation test in *Phillips* and *Richter,* which had factual situations somewhat similar to the facts of this case.

¶ 68. In *Phillips,* three agents from the Metro Drug Unit of the Racine County Sheriff's Department went to Phillips' home to perform a "knock and talk" encounter based on information from a confidential informant that Phillips was involved in the sale of marijuana. *Phillips,* 218 Wis. 2d at 185–86. When they arrived, the agents saw a man they believed to be Phillips standing near the rear of his residence. The man walked down a staircase into the cellar. *Id.* One of the agents stood at the top of the stairwell and got Phillips' attention. *Id.* The agents then walked down the staircase into the basement area in which Phillips lived. *Id.* The agents did not request and never obtained permission to enter the basement. *Id.* at 187. Once inside, however, they explained to Phillips the information they received from the informant and told him that they intended to collect illegal items Phillips possessed. *Id.* Phillips walked into his bedroom, gave the illegal items to the officers, and then gave the officers consent to search the rest of the bedroom. *Id.* at 187–88.

¶ 69. After holding that Phillips voluntarily gave consent for the search, this court applied the three-factor *Brown* attenuation test. *Id.* at 205–12. First, it noted that temporal proximity weighed against attenuation because only a few minutes had passed from the entry, *id.* at 206, but the court noted that the short temporal span was mitigated by the conditions surrounding the search, *id.* at 206–07. Second, the court held that the short discussion between one agent and Phillips was a significant meaningful intervening circumstance, because it "provided the defendant with

sufficient information with which he could decide whether to freely consent to the search of his bedroom." *Id.* at 208–09. Third, the court concluded that the agents' activity was not purposeful or flagrant because there was no evidence of bad faith, they did not uncover evidence as a result of the illegal entry used to influence consent, and they did not go into the basement without individualized suspicion. *Id.* at 210. The court also noted that the agents did not enter the basement through trickery or deception, or "by breaking through, unlocking, or even opening a window or door." *Id.* at 211. Accordingly, the court concluded that the search was sufficiently attenuated to purge the taint of the illegal entry. *Id.* at 212.

¶ 70. In *Richter,* this court again took up the three-part *Brown* attenuation test. An officer was investigating a break-in, and the victim told the officer that she witnessed the intruder run into a trailer. *Richter,* 235 Wis. 2d 524, ¶ 3. The officer went to the trailer, observed signs of forced entry, and woke up two occupants of the trailer by shining a flashlight in the window and announcing his presence. *Id.,* ¶¶ 4–5. The two people had been sleeping on the floor of the trailer. They woke up and came to the door. *Id.,* ¶ 6. The officer entered the trailer and woke up Richter, the owner, who told the officer he could search the trailer for the intruder. *Id.,* ¶ 7. While searching the trailer, the officer discovered marijuana. *Id.,* ¶ 9.

¶ 71. This court upheld the search on grounds that the entry was justified by exigent circumstances, but went on to clarify the application of the attenuation doctrine. *Id.,* ¶¶ 44–45. First, the court acknowledged the extremely short temporal proximity between the entry and the search. *Id.,* ¶ 46. It then noted that the facts that the officer was armed and that he woke

Richter from a deep sleep were not "sufficiently aggravating to transform this non-threatening, non-custodial situation into one which weighs against attenuation." *Id.*, ¶ 47. Second, the court clarified that meaningful intervening circumstances could exist even though the officer did not inform the resident that he did not have a warrant or that the resident was free to refuse consent. *Id.*, ¶ 48. Third, the court found that the officer's conduct was not purposeful or flagrant because the investigation was not directed at Richter, but rather at a fleeing burglar. *Id.*, ¶ 54. Accordingly, the court concluded that, even if exigent circumstances were not present, Richter's consent was sufficiently attenuated from the entry to purge any taint. *Id.*, ¶ 55.

¶ 72. We now apply the three *Brown* attenuation factors to the facts of this case. In doing so, we examine the temporal proximity of the illegal entry and the search, the existence of meaningful intervening circumstances, and the purposefulness and flagrancy of the police conduct.

1. Temporal Proximity

¶ 73. The first *Brown* factor is temporal proximity—the time between the illegal entry and the search. In *Rawlings v. Kentucky*, 448 U.S. 98, 100–01 (1980), a period of 45 minutes passed from the beginning of an illegal detention to a confession. The Supreme Court held that "under the strictest of custodial conditions such a short lapse of time might not suffice to purge the initial taint," but it was necessary to examine the nature of the conditions. *Id.* at 107. The Court held that the "congenial atmosphere" outweighed the relatively short time period. *Id.* at 108. In both

*Phillips* and *Richter,* the temporal proximity was only a matter of minutes. However, the non-custodial and non-threatening nature of the situations in those cases mitigated the impact of the short time period.

¶ 74. In the present case, the court of appeals analyzed the temporal proximity factor and determined that the lapse in time between the illegal entry and the request for consent was "more than the few minutes present" in *Phillips. Artic,* 316 Wis. 2d 133, ¶ 25. The court stated that "the number of events that transpired from the entry—start of the search downstairs, knocking at the upstairs door, waiting, entry upstairs, more waiting and talking at the kitchen table—constitute a significant temporal distance from the unlawful downstairs entry." *Id.*

¶ 75. Evaluating temporal proximity entails a "measurement of the intervening time." *Phillips,* 218 Wis. 2d at 213. How much time passed between one event and another? We think it is likely that more time passed between the illegal entry and the request for consent in this case than the time that passed in either *Phillips* or *Richter.* However, the amount of time that passed should not be overstated. Admittedly, it was relatively brief. The passage of time is important, but time is not necessarily of the essence when it is outweighed by other factors in an attenuation analysis.

¶ 76. Here, the record does not provide the exact time period from the illegal entry to the subsequent consent to search. After breaking in the front doors, the officers secured the first floor of the residence. There was no clear indication of how long this took. The officers then proceeded up the stairs where they knocked, waited a short period of time for Artic to answer, then entered the residence with permission. They then waited for Grafton to get dressed and enter

the kitchen. It was "very shortly thereafter" that Wagner asked Artic for consent. Therefore, although the time span is unclear, it appears from the record that it was not more than about five minutes. This short temporal proximity weighs against a finding of attenuation.

¶ 77. In this case, as in *Rawlings, Phillips,* and *Richter,* other circumstances mitigate the short time span. In *Rawlings,* the Supreme Court found congenial conditions to be a mitigating factor even though the officers detained the residents while other officers obtained a search warrant. *Rawlings,* 448 U.S. at 107–08. In both *Phillips* and *Richter,* this court considered the fact that the conditions were non-custodial when weighing the short temporal proximity. *Phillips,* 218 Wis. 2d at 207; *Richter,* 235 Wis. 2d 524, ¶ 47.

¶ 78. Here, neither Artic nor Grafton was in custody. Wagner displayed a weapon at the beginning of the encounter, but holstered it shortly afterward. For the reasons discussed earlier,[12] the evidence suggests that the incident evolved into a relatively congenial and non-threatening encounter, culminating in Artic and Wagner discussing "family and stuff" while sitting at the kitchen table. Therefore, while the short temporal proximity does weigh against attenuation, its impact is mitigated by the congenial and non-threatening conditions at the time of consent.

---

[12] In examining the nature of the conditions, we note that while the analyses of attenuation and voluntariness "overlap to a considerable degree, they address separate constitutional values and they are not always coterminous." *Phillips,* 218 Wis. 2d at 205 n.9 (quoting *United States v. Melendez-Garcia,* 28 F.3d 1046, 1054 (10th Cir. 1994)).

## 2. Intervening Circumstances

¶ 79. The second *Brown* factor is the presence or absence of meaningful intervening circumstances. This factor concerns whether the defendant acted "of free will unaffected by the initial illegality." *Rawlings,* 448 U.S. at 108 (quoting *Brown,* 442 U.S. at 603).[13] In both *Phillips* and *Richter,* significant intervening circumstances existed based on forthright conversations that officers had with the people who gave consent. In *Bermudez* and *Kiekhefer,* however, the court of appeals refused to find meaningful intervening circumstances where the officers made unannounced entries that improperly surprised, frightened, or confused the defendants. *Bermudez,* 221 Wis. 2d at 355; *Kiekhefer,* 212 Wis. 2d at 482–83. Thus, in addressing this issue, we look to whether the officers "exploit[ed] their unlawful entry . . . by surprising or misleading the defendant into consenting to the search." *Phillips,* 218 Wis. 2d at 209.

¶ 80. The record here demonstrates the existence of meaningful intervening circumstances following the illegal entry on the ground floor.

¶ 81. First, the court of appeals concluded that the most meaningful intervening circumstance was "the consensual opening of the door by Artic." *Artic,* 316 Wis. 2d 133, ¶ 26. "Even Artic's version of events agrees that the police waited after knocking and identifying themselves." *Id.* Artic "admits that he then opened the

---

[13] In *Rawlings,* the sufficiently untainted act of free will was the defendant's spontaneous admission that drugs found in another person's purse were actually his. *Id.*

door to the police. They did not force entry or threaten to enter. They knocked and waited." *Id.*

¶ 82. This record does not support Artic's present argument that Detective Wagner made a "demand to open the door."

¶ 83. Putting the police entry into context, Artic testified at trial that he watched the video monitor and saw the police at his front door. He was therefore not surprised when an officer knocked on the door of the second-floor unit. Artic was prepared, and he bought time by replying "just a minute." He opened the door and, upon request, gave Detective Wagner and a colleague permission to come in.

¶ 84. Second, beginning with the knock on the upstairs door, the police made accommodations. They waited for Artic to open the door. Wagner quickly holstered his weapon. The officers waited for Winnie Grafton to get dressed and come into the kitchen. The police did not frisk Artic or Grafton. They did not see any incriminating evidence in plain view and they did not find the video monitor until later. Consequently, they did not treat Artic as a suspect or challenge his failure to respond to their loud "knock and announce" at the front door. Overall, they made a concerted effort to diffuse a tense situation.

■■■

¶ 85. To constitute sufficient intervening circumstances, the interim facts or evidence must show a "discontinuity between the illegal [entry] and the consent such that the original illegality is weakened and attenuated." *United States v. Gregory*, 79 F.3d 973, 980 (10th Cir. 1996). In this case, Artic watched the illegality on a monitor and responded with cool sangfroid, delaying police entry and delaying any investigation

until the arrival of Grafton, while orchestrating the destruction of incriminating evidence. He and Grafton then engaged officers in a congenial conversation.

¶ 86. Third, there were two sides to the conversation, with each side playing a role. The officers explained what had transpired: their presence in the area, the arrest of Artic's son with a large amount of cocaine immediately after he was seen leaving the house, their desire to know if his son had left any cocaine behind, their lack of a search warrant. There was nothing deceptive in their information, although Artic must have believed the police suspected more. For his part, Artic said he could not remember when he had last seen his son, could not believe his son would be involved in drugs at his house, and was willing to consent to search because he had nothing to hide. Artic did not attempt to withhold what officers easily could have discovered and perhaps already knew: that he was on supervision for a prior offense. In short, Artic had the presence of mind to delay the police twice, see that evidence was destroyed, lie to the police, and decline to sign any written consent to search.

¶ 87. In one sense, the congenial conversation provided Artic with sufficient information to "decide whether to freely consent to the search." *Richter,* 235 Wis. 2d 524, ¶ 50 (quoting *Phillips,* 218 Wis. 2d at 208–09). In another sense, however, Artic made a strategic decision, skillfully playing the hand he was dealt and consenting to a search in the mistaken belief that police would no longer be able to find incriminating evidence.

¶ 88. The intervening circumstances in this case are more significant than those in either *Phillips* or *Richter* because the officers in those cases made entry directly into the residence that they ultimately received

consent to search. In contrast, the illegal entry here occurred in the first-floor unit.

¶ 89. The record demonstrates that Artic's upstairs unit was separate from the downstairs unit and that the upstairs unit was his current residence. Artic explained that he "lived on the second floor" and that at the time of the search, both Matthew and Grafton were "living downstairs." Therefore, the officers' decision to knock and announce at the upstairs door constitutes a significant intervening circumstance.[14]

¶ 90. Finally, Artic's counsel suggests that this case is analogous to *Bermudez* in that Artic must have been "surprised, frightened, or confused" when the officers arrived at his door. But Artic's testimony suggests otherwise. Artic testified that he woke up to a loud thump. He saw people kicking at his front door through the monitor for his closed-circuit camera, and he suspected they were the police because of the cars outside. Artic said that after the officers entered the home, he heard Grafton fumbling with something in the bathroom and warned her that the police were on their way. He then deliberately delayed answering the door to give Grafton more time to dispose of cocaine. While Grafton was in the bathroom, Artic approached the door to his unit to meet the police there. Although he testified that he "panicked," the record does not support the conclusion that Artic was surprised, frightened, or confused by the police presence in a way that would diminish the meaningfulness of the intervening circumstances.

---

[14] Even if the upstairs were not a separate residence, it is relevant that the officers treated it as such. Wagner testified that he knocked and announced at the upper door because he "was unsure if this was a duplex where there was two separate residences."

### 3. Purposefulness and Flagrancy of the Police Conduct

¶ 91. The third *Brown* factor is the purposefulness and flagrancy of the police conduct. This factor is "particularly" important because it goes to the heart of the exclusionary rule's objective of deterring unlawful police conduct. *Phillips,* 218 Wis. 2d at 209 (citing *Brown,* 422 U.S. at 604). In *Brown,* the Court determined that an illegal detention was purposeful because the detectives arrested the defendant "in the hope that something might turn up," in a manner that "[gave] the appearance of having been calculated to cause surprise, fright, and confusion." *Brown,* 422 U.S. at 605. Police conduct may be purposeful or flagrant if "the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless." *United States v. Carter,* 573 F.3d 418, 425 (7th Cir. 2009) (quoting *United States v. Simpson,* 439 F.3d 490, 496 (8th Cir. 2006). This court has considered "whether there is evidence of some degree of bad faith exploitation of the situation on the part of the officer." *Richter,* 235 Wis. 2d 524, ¶ 53. Conversely, "courts frequently hesitate to find that an officer's violation of the law was 'purposeful' or 'flagrant' when the officer broke the law acting in good faith." *United States v. Washington,* 387 F.3d 1060, 1075 (9th Cir. 2004).

¶ 92. In this case, the officers entered the house based upon their belief that exigent circumstances existed. Their belief in exigent circumstances was based, in turn, on observations that Detective Davila made from within the curtilage of Artic's residence. Accordingly, we must examine the nature of Davila's presence in the curtilage.

436

¶ 93. Curtilage is the land immediately surrounding a house. *Oliver v. United States*, 466 U.S. 170, 178, 180 (1984). Because curtilage is "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' " it is considered part of the home itself under Fourth Amendment analysis. *Id.* at 180 (Powell, J., concurring). The curtilage is defined by factors that determine "whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.* The existence of a fence is an important factor in delineating the curtilage of a home. *United States v. Dunn*, 480 U.S. 294, 301 n.4 (1987); *Martwick*, 231 Wis. 2d 801, ¶ 37 (noting that the owner did not erect a fence when determining that plants were not within the curtilage of the home).

¶ 94. In this case, the fenced-in area immediately adjacent to the back of Artic's house must be regarded as curtilage. The general rule is that law enforcement may not search this area of a private residence without "a search warrant (or some exception to the warrant requirement)." *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001). Here, Detective Davila did not have a warrant to enter the fenced-in area to position herself near the rear door. She did not know whether anyone was in the house. Consequently, she did not have probable cause to believe that someone would try to escape from the house.

¶ 95. Nevertheless, we recognize that officers may sometimes enter curtilage to further a "legitimate law enforcement objective" when the restriction upon a person's privacy is limited. *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). The officer's reason for

entering the curtilage must be "unconnected with a search of the premises directed against the accused." *United States v. Bradshaw*, 490 F.2d 1097, 1100 (4th Cir. 1974); *see also United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006). An officer may, for example, come within the curtilage in order to serve civil process on the homeowner. *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001). Some courts have also defined an exception permitting officers to enter the curtilage when engaging in a "knock and talk" investigation. *See Hardesty v. Hamburg Twp.*, 416 F.3d 646, 654 (6th Cir. 2006); *see also United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (holding that a "knock and talk" is a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity"). Several courts have extended this exception to permit officers to enter the back yard in search of a homeowner when nobody answers the front door.[15]

¶ 96. In this case, Detective Davila's purpose for entering the curtilage was not to search the area or investigate the back of the house but to prevent any person in the house from trying to escape.

¶ 97. Detective Davila's entry into the curtilage of Artic's house was not permitted by the Fourth Amendment on the basis of information she had at the time. However, we are not required to determine that her presence in the fenced-in portion of Artic's back yard

[15] These courts include the Third, Fourth, Sixth, Eighth, and Ninth Circuits. *See Hardesty v. Hamburg Township*, 461 F.3d 646, 664 (6th Cir. 2007); *Estate of Smith v. Marasco*, 318 F.3d 497, 520–21 (3d Cir. 2003); *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977); *United States v. Bradshaw*, 490 F.2d 1097, 1101 (4th Cir. 1974).

was lawful or that her observations there permitted other officers to break in the front door based on exigent circumstances as a prerequisite to our conclusion that police conduct was not "flagrant" or "purposeful." Securing the rear door by entering the curtilage was not, under the circumstances, flagrant conduct. Entering the curtilage advanced a legitimate law enforcement objective—securing the premises in preparation for an anticipated search warrant and preventing an escape if someone in the house tried to escape— without an undue invasion of privacy. *See United States v. Scheets,* 188 F.3d 829, 840 (7th Cir. 1999) (citing *Segura v. United States,* 468 U.S. 796, 810 (1984)) ("Law enforcement officers may seize an area to avoid the destruction or removal of evidence when probable cause to search the area exists."); *United States v. Ruiz-Estrada,* 312 F.3d 398, 404 (8th Cir. 2002) ("The act of securing [an] apartment while awaiting a search warrant comports with the Fourth Amendment.").

¶ 98. When Detective Davila noticed the upstairs light go out as police announced their presence at the front door, and when she heard the phone ringing and scurrying movement inside the house, she drew the reasonable inference that the occupants of the house did not wish to be seen and could very well be involved in trying to destroy evidence. While the resulting entry through the front door was illegal, it was neither illogical nor unnatural under the circumstances.

¶ 99. Once Davila relayed her information to the other officers, those officers acted on a reasonable belief that evidence might be destroyed. They had reason to believe drugs were in the residence based on the fact that Rob had left the residence moments before his arrest. Wagner observed a camera near the front door of the house, which was characteristic of houses he had inves-

tigated for drugs and drug offenses.[16] Wagner knocked and announced loudly enough that Artic could hear him. At this point, Davila relayed her observations about the light turning off, phone ringing, and scurrying footsteps on the stairs. Wagner testified that the officers' forced entry was based upon their belief that evidence was being destroyed, and nothing in the record suggests that this belief was not genuine. The fact that Davila's observations were made unlawfully from within the curtilage rendered the officers' subsequent entry illegal, but it did not make the entry purposeful or flagrant for the purposes of attenuation analysis.

¶ 100. The officers did not enter the house after Rob's arrest because they were targeting his father. Davila did not go to the back of the house to search for evidence against him. This was not a circumstance in which she "went in merely to see if there was anything worth getting a warrant for." *Murray v. United States,* 487 U.S. 533, 540 n.2. Events played out in an unexpected fashion. Similar to *Richter,* where the officer was pursuing a fleeing burglar, there was no evidence "that [the officer] entered Richter's home with ulterior motives, to undermine Richter's rights, to pressure him to consent, or to otherwise exploit the situation in hopes of finding evidence *against Richter." Richter,* 235 Wis. 2d 524, ¶ 54.

¶ 101. Artic compares the facts of this case to *Bermudez,* in which the court of appeals held that "the facts suggest[ed] an orchestrated attempt to collect further incriminating evidence." *Bermudez,* 221 Wis. 2d at 357. In *Bermudez,* however, the facts were inconsis-

---

[16] The circuit court found that the presence of the camera, coupled with Rob's arrest and the information provided by the confidential informant, heightened the officers' suspicion that drugs may have been in the home.

tent with the officers' stated purpose for the entry.[17] *Id.* at 356–57. That is not the case here.

¶ 102. Nothing in the record suggests the officers acted in bad faith or under a pretext. The officers testified extensively regarding their initial investigation, and the police presence was consistent with these activities. Although the observations supporting their belief in exigent circumstances were made illegally, the officers' behavior upon entering the residence was consistent with their goal of preventing the destruction of evidence. Furthermore, they were specifically investigating Artic's son, not Artic himself. They did not know that Artic was a resident of the building and, in fact, were surprised to encounter him.[18]

¶ 103. Finally, Artic argues that the officers' illegal activity was purposeful and flagrant because the officers forced entry into the house. He relies on language in *Phillips* noting that the agents in that case did not gain entry by "breaking through, unlocking, or even opening a window or door." *Phillips,* 218 Wis. 2d at 211. Although the fact that the officers forced entry certainly makes their entry more flagrant than it would be if they had simply opened a door, the flagrancy is mitigated by

---

[17] Specifically, the court of appeals held that it was "disingenuous for the officers involved to testify that their only purpose in going to the motel room was to inform [the defendant's wife] that her husband had been arrested." *Bermudez,* 221 Wis. 2d at 356. The court concluded that the officers' subsequent actions revealed their "ulterior motive." *Id.*

[18] Wagner testified that when Artic answered the door, Wagner "was surprised because he seemed like an elderly gentleman, and I wasn't sure—I wasn't sure if this was a duplex or a single family. It was kind of confusing all at once." This kind of confusion is inconsistent with an orchestrated plan to exploit an illegal entry for the purposes of obtaining evidence against Artic.

the fact that the officers forced entry into the building generally, not into Artic's upstairs living quarters.

¶ 104. Artic cites *United States v. Robeles-Ortega,* 348 F.3d 679 (7th Cir. 2003), which is instructive on this point. In *Robeles-Ortega,* the Seventh Circuit found the officers' activity flagrant where they "literally broke down the door, without exigent circumstances and without a warrant, and at least five agents rushed into the apartment with guns." *Id.* at 684. The officers then ordered the occupants to lie on the ground. *Id.* The Seventh Circuit held that the manner of the entry "gave the appearance of having been calculated to cause surprise, fright, and confusion." *Id.* (quoting *Brown,* 422 U.S. at 605).

¶ 105. While the officers here did break down the front doors to the building, there is nothing in the record to suggest that their actions were calculated to surprise, frighten, or confuse Artic, whom they did not realize was an occupant of the house. The officers were furthering a legitimate law enforcement purpose, *see Scheets,* 188 F.3d at 840, acting on a reasonable belief that evidence might be destroyed, and not specifically targeting Artic. In sum, the record simply does not suggest "bad faith exploitation of the situation on the part of the officer[s]." *Richter,* 235 Wis. 2d 524, ¶ 53. Therefore, their actions were neither purposeful nor flagrant, and this factor weighs in favor of attenuation.

## IV. CONCLUSION

¶ 106. We conclude that Artic's consent to search was given freely and voluntarily, and not merely in acquiescence to police authority. We also conclude that the police search of Artic's upper-level residence was sufficiently attenuated from the illegal entry to purge

442

the primary taint of that entry. While the temporal proximity was short, meaningful intervening circumstances took place and the official conduct was neither flagrant nor purposeful. For these reasons, Artic was not prejudiced by his counsel's failure in the suppression motion to raise the argument that the police created their own exigent circumstances and to object to testimony about observations made illegally from within the curtilage of Artic's house. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 107. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). The majority acknowledges that the following occurred in this case:

- Milwaukee police contemplated obtaining a search warrant for Artic's home but specifically chose not to do so, instead proceeding without one. Majority op., ¶ 8.

- Several officers approached the home. One unlawfully entered the curtilage of Artic's property behind the house while others aggressively knocked and yelled at the front door. Majority op., ¶¶ 9–10.

- When no response was forthcoming, the officers forcibly kicked in one door and broke out a window in a second to make a forced, warrantless entry. Majority op., ¶ 11.

- Police searched the downstairs portions of defendant's house before confronting him in his upstairs rooms. Police had weapons drawn during this encounter. Majority op., ¶ 12–13.

- Still without seeking a warrant, police had a conversation with the defendant for which there are con-

443

flicting accounts but following which police searched the upstairs rooms.

¶ 108. Given this undisputed sequence of events, given that the State bears the burden of establishing why the fruits of this warrantless and unconstitutional entry should be admitted, and given the spotty factual record on which the majority's analysis relies, it is remarkable that the majority determines that the evidence obtained following a concededly unconstitutional forced entry to the home was nevertheless properly used in court.

¶ 109. I cannot agree with the majority's analysis of either of the two key inquiries: the voluntariness of consent and its attenuation from the unlawful police conduct. I discuss each in turn.

I

¶ 110. The majority's conclusion that consent was voluntarily given in this case does not, in my view, faithfully apply the governing law. The majority begins its analysis by reciting the established principles governing voluntary consent,[1] but then walks away from these principles when it applies the law to the facts of this case.[2] In particular, the majority does not take

---

[1] Majority op., ¶ 32.

[2] The circuit court found as a matter of fact that Artic gave oral consent to search. *See* majority op., ¶ 31. The question becomes whether consent was given voluntarily, which is a question of "constitutional fact." A reviewing court independently applies the constitutional principles to the historic and evidentiary facts to determine whether the standard of voluntariness has been met. *State v. Phillips,* 218 Wis. 2d 180, 195, 577 N.W.2d 794 (1998).

444

seriously either the evaluation of the totality of the circumstances or the applicable burden of proof, which is placed on the State.

## A

¶ 111. Although the majority recites that determining voluntariness turns on the totality of the circumstances,[3] the majority's analysis then ignores a key, overarching circumstance in this case, namely that the encounter between Artic and the police was precipitated by a forcible, unlawful, and warrantless entry into Artic's home. In my view the majority's analysis thereby ignores the obvious. In the context of the coercive effect of the forced entry, the majority also significantly understates the legal significance of the fact that police confronted Artic with weapons drawn.

¶ 112. The real question, as the majority acknowledges, is whether a statement of consent was the result of express or implied duress or coercion, majority op., ¶ 34. Mere "acquiescence to a claim of lawful authority" does not provide for a statement of consent that the law considers voluntary.[4]

¶ 113. Viewing the totality of the circumstances more candidly than the majority has done, I conclude that any consent given by Artic was an "acquiescence" to the assertion of police authority, rather than a statement of consent that the law treats as willing and voluntary.

¶ 114. The majority analyzes the six voluntariness factors focused only on events transpiring in the upstairs of Artic's residence, as if the encounter be-

---

[3] Majority op., ¶¶ 32–33.

[4] Majority op., ¶ 32 (quoting *Bumper v. North Carolina,* 391 U.S. 543, 548–49 (1968)).

tween Wagner and Artic began at the time Artic opened the upstairs door.[5] Of course that is not what happened. The police knocked and yelled very loudly at the outside door for between 30 to 60 seconds.[6] When there was no answer within that time, police made a forced entry. Police therefore reached Artic's upstairs rooms only after they kicked down one locked door and broke a window to force entry through a second, then passed through and searched the downstairs portions of the house with guns drawn. *See* majority op., ¶ 11.[7]

¶ 115. The State has conceded, and the majority concludes, that the forced entry into the home was unconstitutional. Majority op., ¶ 26. But the majority treats the encounter upstairs as unrelated to the forced entry that precipitated it. The majority therefore does not candidly address the true totality of the circumstances.

---

[5] For example, in addressing whether police threatened or intimidated Artic, the majority begins its discussion with the moment "when Artic opened the door to the second-floor unit." Majority op., ¶ 39.

Likewise, when the majority addresses whether conditions were "non-threatening and cooperative," it begins its discussion at the time officers knocked on Artic's [upstairs] door. Majority op., ¶ 44. There is nothing non-threatening or cooperative about the circumstance where a police officer breaks through two locked doors to gain entry to a private house.

[6] At the suppression hearing, Detective Wagner described his knocking as "very loud. At first it was just I would say a regular knock, and then it got louder." Asked about his announcements of "Milwaukee Police," Detective Wagner stated, "It was shouting." Detective Davila testified that she yelled many times from the back of the house to the officers in the front.

[7] At the suppression hearing, Detective Wagner testified that his weapon was drawn at the time he entered the residence.

¶ 116. Wouldn't Artic expect that the police approach to the upstairs would be the same as their approach downstairs? By their actions downstairs, police had indicated their intent to conduct a search and their readiness to do so forcefully and without either consent or a warrant. As the majority elsewhere points out, Artic himself watched police kick down the front door on closed-circuit video.[8] Given how the upstairs encounter came to pass, any consent given by Artic amounted to no more than an acquiescence to a robust display of police authority.

¶ 117. The majority also downplays the coercive effect of the officers' being armed and the fact that Detective Wagner has his weapon drawn when Artic opened the upstairs door. "The 'display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent.' "[9]

¶ 118. In distinguishing the cases cited by Artic in which a display of weapons demonstrated that consent was an acquiescence rather than a voluntary choice, the majority continues to be in denial about the fact that an unlawful entry to the house had already taken place.

¶ 119. Of course no two cases present identical facts, but the cases suggest that a display of weapons inside the home after police had already made one forced entry should weigh heavily against a determination of voluntary consent here. The majority cites no case that combines these elements.[10]

---

[8] Majority op., ¶ 90.

[9] 4 Wayne R. LaFave *Search and Seizure: A Treatise on the Fourth Amendment,* § 8.2(b), at 63 (4th ed. 2004) (quoting *Lowery v. State,* 499 S.W.2d 160 (Tex. Crim. App. 1973)).

[10] The majority, ¶¶ 47–48, relies principally on *United States v. Smith,* 973 F.2d 1374 (8th Cir. 1992). There, officers

¶ 120. By arbitrarily limiting its factual analysis to events that happened upstairs and by downplaying the display of weapons, the majority departs from what it has promised to do and what the law requires: to evaluate the totality of the circumstances.

¶ 121. When Artic, aware that several officers had already forced entry into his house, opened an inside door to meet a police officer who had a gun drawn and who informed Artic that he had done all this without a warrant, it hardly stands to reason that Artic believed that refusing further search would be a realistic option. Artic's consent was therefore more what the law considers an acquiescence to authority than a freely given consent. Police had by then already amply demonstrated their willingness and intent to exercise just that authority.

## B

¶ 122. Furthermore, the majority misapplies the burden of proof on key facts in its analysis of consent. The majority acknowledges that a warrantless search of the home is "per se unreasonable" and that the state bears the burden of proving voluntary consent by clear and convincing evidence. The majority thus recites but does not take seriously the State's burden to prove voluntary consent by clear and convincing evidence.

were outside the apartment and obtained consent to enter. There was no unlawful conduct prior to obtaining consent. Simply, officers outside the apartment " 'asked' if they could come inside and Debra Smith stepped aside and motioned for them to come in." 973 F.2d at 1375. The case is not analogous here unless, as the majority does, one treats the upstairs behavior in isolation. The other cases cited by the majority are also inapposite.

¶ 123. In a move critical to its analysis, the majority asserts that the "upstairs unit was separate from the downstairs unit," and that the upstairs was where Artic lived.[11] The record is far from clear and convincing in support of the majority's conclusion.[12] Detective Wagner testified that when he was knocking on the upstairs door he "wasn't sure" whether the building was one residence or two, and that "[i]t was kind of confusing all at once." Evidence that is not sure and is "kind of confusing" is not clear and convincing. The majority thus misapplies the burden of proof to improperly reach a critical conclusion, which it then construes against the defendant.

¶ 124. The majority also resolves vagaries about the role of weapons in the encounter in favor of the State. The majority concedes that the record is "unclear" about the role of weapons in the encounter but nevertheless concludes that the unclear role of weapons did not undermine voluntary consent. Majority op., ¶¶ 45, 46–53. "Unclear" evidence is, obviously, not clear; it is also not convincing. The majority brushes past the lack of clarity about key factual disputes and resolves uncertainties against the defendant. This analysis does not hold the State to its burden.

---

[11] Majority op., ¶ 89.

[12] Artic's trial testimony indicated that both his girlfriend Winnie and another friend named Matt had bedrooms in the downstairs and that neither paid rent. At oral argument, Artic's Attorney summarized the situation as follows:

> Understand, this was Mr. Artic's home, the whole thing was his home. It was a single family dwelling. He happened to have his bedroom upstairs. There was a kitchen upstairs. There was no kitchen on the first floor, there was a shell of a kitchen that had been completely removed—no appliances, no plumbing. This was one home, and . . . the encounter began when police pounded on the front door . . . .

¶ 125. Although the majority concedes that there is "no evidence in the record" that police informed Artic he could withhold consent, the majority nevertheless infers that Artic was aware of this because of his refusal to sign a written consent. This appears to be a factual determination of Artic's subjective knowledge, which is not supported by fact finding from the circuit court. The more realistic inference from the record, in light of the totality of the circumstances, is that whether or not Artic believed that he could refuse consent, he had little reason to believe such a refusal would actually deter police from completing the search of his house that they had already begun.[13] Again, the majority infers facts not in the record about the defendant's subjective knowledge and construes them against the defendant, misallocating the burden.

¶ 126. Because the majority fails to candidly assess the totality of the circumstances, and particularly the bearing of the illegal entry on the encounter in which the circuit court found that consent was given, and because in my view the majority has misapplied the

---

[13] Further compounding its speculation about the defendant's subjective knowledge, the majority also asserts as a "fact" "that Artic believed that Grafton had disposed of the cocaine." Majority op., ¶ 58. There was no fact finding along these lines in the circuit court. It is at most a speculative inference regarding the defendant's subjective knowledge.

The majority also determines that "there was mutual apprehension" when Artic opened the door," majority op., ¶ 39, and that the "tension" between an obvious criminal suspect and the police who had forced entry into his house "appears to have dissipated quickly." No witness testified to the majority's conclusions regarding "mutual apprehension." Such supposition of "facts" by an appellate court is contrary to our standard of review and further distorts the majority's allocation of the burden in this case.

burden of proof by resolving key factual uncertainties in favor of the State, I cannot join the majority's conclusion that consent was voluntarily given in this case.

¶ 127. The State has not met its burden. Artic "consented to the choice at time when he had no real choice, and he had no real choice because of police misconduct." *United States v. Collins*, 510 F.3d 697, 701 (7th Cir. 2007).

## II

¶ 128. Having concluded that any consent given in this case does not meet the constitutional requirement for being voluntarily given, I might dissent on that ground alone. I write further, however, to respond to the majority's application of the attenuation doctrine, which, in my opinion, continues to be out of sync with the controlling federal interpretations of the Fourth Amendment and risks further "making a mockery of the attenuation doctrine."[14]

¶ 129. In applying the three-part analysis of attenuation from *Brown v. Illinois*, 422 U.S. 590 (1975), the majority acknowledges that the passage of time (the "temporal proximity") between the illegal entry and the request for consent in this case was "relatively brief," "not more than about five minutes." Majority op., ¶¶ 75, 76. The majority understates the case when it determines that this short timeframe "weighs against a finding of attenuation."

¶ 130. The only federal case to which the majority cites is *Rawlings v. Kentucky*, 448 U.S. 98, 100–01 (1980). There, the Court considered a 45–minute period

---

[14] *State v. Richter*, 2000 WI 58, ¶ 64, 235 Wis. 2d 524, 612 N.W.2d 29 (Abrahamson, C.J., dissenting).

of time to be "a short lapse," and indicated that in custodial circumstances it would in fact be too short. *See* majority op., ¶ 73.

¶ 131. In the present case, the circumstances were custodial (a reasonable person in Artic's position would not have felt free to leave), and the time was much shorter. Inexplicably, the majority determines that this short time is mitigated by the "congenial and non-threatening conditions" which the majority has determined existed just minutes after police kicked down Artic's front door while he watched on a video monitor.

¶ 132. The majority's analysis of timing is not consistent with other cases. In *Dunaway v. New York,* 442 U.S. 200, 218 (1979), one and one-half hours was too short. Likewise, in *Taylor v. Alabama,* 457 U.S. 687, 691 (1982), a confession obtained approximately six hours after an illegal arrest was determined not sufficiently attenuated. To the extent that the analysis of "temporal proximity" in this case is consistent with Wisconsin case law, it indicates how far this court's attenuation analysis has strayed from the controlling interpretations of Fourth Amendment doctrine from the United States Supreme Court.

¶ 133. It is in its analysis of "intervening circumstances" that the majority opinion works a novel misapplication of Fourth Amendment law. The majority asserts that there were "meaningful intervening circumstances following the illegal entry on the ground floor." But rather than identify a factual discontinuity of the kind previously recognized in the case law, the majority focuses on the defendant's conduct and apparently on his state of mind. *See* majority op., ¶¶ 80, 85–87.

452

¶ 134. The majority recognizes that a proper intervening circumstance "must show a 'discontinuity between the illegal [entry] and the consent." Majority op., ¶ 85 (quoting *United States v. Gregory,* 79 F.3d 973, 980 (10th Cir. 1996)).

¶ 135. Here there was no discontinuity in light of the question underlying the three *Brown v. Illinois* factors: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality . . . ." *Wong Sun v. United States,* 371 U.S. 471, 488 (1963); majority op., ¶ 64. The majority treats the encounter in Artic's upstairs kitchen as if the encounter itself provides the intervening circumstance that makes the subsequent search attenuated. In my view, it is the upstairs encounter itself and the consent given therein which were plainly "come at by exploitation of" the unlawful entry into the house in the first place.[15]

¶ 136. The problem is that the majority then fails to identify a factual discontinuity or intervening circumstance that occurred in this case. The facts in this case show a continuous course of action over "not more than five minutes" from when police forced entry

[15] As Professor LaFave explains regarding the validity of a search justified by consent, "While there is sufficient overlap of the voluntariness and fruits tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was both voluntary and not an exploitation of the prior illegality." 4 LaFave, *supra* note 9, § 8.2(d), at 76. *See also United States v. Robeles-Ortega,* 348 F.3d 679, 683 (7th Cir. 2003) ("[T]he voluntariness of the consent is only the first step, and the next inquiry is whether the consent was tainted by the entry, in other words, whether it was the product of that illegal entry.").

through the outside door, swept through the lower rooms of the house, moved upstairs, knocked and entered Artic's upstairs door and searched the upstairs premises. The majority fails to identify any intervening facts or circumstances in the course of the police actions initiated by that illegality and culminating in the search.

¶ 137. Perhaps because it cannot identify a meaningful discontinuity in the circumstances, the majority instead oddly focuses on Artic's behavior and subjective state of mind, noting his "cool sangfroid," his "presence of mind," his "strategic decision[s]" and the fact that he was not surprised, frightened, or confused.[16] An inquiry into the mind of the defendant is unrelated to the question whether an intervening circumstance created sufficient discontinuity or attenuation to break the connection between the unlawful police conduct and the evidence thereby obtained. "Consent alone does not necessarily purge the taint of the illegal action." *Robeles-Ortega,* 348 F.3d at 684.

¶ 138. Whether Artic kept his "presence of mind" or merely was resigned to the search is not relevant to the determination of the circumstances that reveal

[16] The majority also determines (without explanation) that the very brief time in which police knocked on the upstairs door and "the consensual opening of the door" constitute an intervening circumstance. Majority op., ¶ 81. Contradicting itself, the majority asserts that Artic was "prepared" for police to enter his apartment because he had been watching the downstairs entry by video. Majority op., ¶ 83. Thus the majority corroborates what the time analysis reveals: that the entry and search amount to a single, continuous course of police conduct.

The majority goes on to make the additional factual assertions that police "did not treat Artic as a suspect," and "made a concerted effort to diffuse a tense situation," without citation to record facts.

attenuation. The same evidence that would be suppressed against a panicky defendant is not admissible simply because the suspect remained calm.

¶ 139. The United States Supreme Court has rejected just the type of argument on which the majority relies. In *Taylor v. Alabama,* 457 U.S. 687 (1982), the petitioner was unlawfully arrested and detained. He was fingerprinted and put in a lineup and though he spent most of the time during which he was detained by himself, he eventually visited with two friends. Following this visit he executed a waiver of rights and a written confession. The State argued, much as the majority insinuates here, that the defendant "had every opportunity to consider his situation, to organize his thoughts, to contemplate his constitutional rights, and to exercise his free will."

¶ 140. The Supreme Court rejected the State's characterization and determined that the confession was insufficiently attenuated from the illegal arrest and that the defendant's statement was therefore inadmissible. This result was reached even when the defendant there had several hours' time to consider his decision; he had time out of the presence of police, as Artic did not; his location changed, as Artic's did not; he visited with friends who were not in custody, as Artic did not; and he executed two written documents waiving his rights and entering a statement, as Artic did not. Yet none of those arguably intervening circumstances in *Taylor* was sufficient for the United States Supreme Court to determine that the confession was sufficiently attenuated from the unlawful arrest.

¶ 141. The United States Supreme Court analysis thus teaches that the consent and search of the upstairs rooms here was not sufficiently attenuated from the initial unlawful entry to render the evidence admissible.

¶ 142. The third *Brown v. Illinois* factor, as analyzed by the majority, is the "purposefulness and flagrancy of the police conduct." Majority op., ¶¶ 91–105. The majority concludes that the police conduct was not "purposeful" or "flagrant."

¶ 143. The majority is misguided when it concludes that the police conduct was not "purposeful." *See* majority op., ¶ 97. In *State v. Richter,* 2000 WI 58, 235 Wis. 2d 524, 612 N.W.2d 29, this court analyzed the police "purpose" in attenuation analysis by noting that "Richter was not the target of the officer's investigation or search." *Richter,* 235 Wis. 2d 524, ¶ 54. There the police entered the home for reasons unrelated to investigating Richter, believing instead that they were in pursuit of a burglar. Here, by contrast, police entered the home with the very purpose which they eventually carried out: securing and seizing evidence of drug crimes and apprehending any persons involved.[17]

---

[17] The majority opinion acknowledges that this was a "knock and talk" procedure. This procedure is described as one in which "police approach a house or apartment in which they suspect drug dealing . . . [and] listen outside the door . . . . [T]hen they knock on the door and attempt to persuade whoever answers to give them permission to enter. If consent is forthcoming, they enter and interview the occupants of the place; if it is not, they try to see from their vantage point at the door whether drug paraphernalia or contraband is in plain view. If it is, then they make a warrantless entry. As this description makes plain, the 'knock and talk procedure typically does not involve the prior issuance of a warrant.' " *State v. Robinson,* 2010 WI 80, ¶ 7 n.5, 327 Wis. 2d 302, 786 N.W.2d 463 (quoting *United States v. Johnson,* 170 F.3d 708, 711 (7th Cir. 1999)).

Clearly the "purpose" of the knock and talk procedure, in general and as employed here, is to secure, if possible, drug evidence, without obtaining a warrant.

¶ 144. The majority also concludes that the unconstitutional entry was not "flagrant," a point which the parties vigorously dispute. Once again, the majority allows its focus on one isolated piece of the three-factor attenuation analysis to obscure the overarching attenuation inquiry, which, as the majority recognizes, aims to discern when "the deterrent effect of the exclusionary rule no longer justifies its cost." Majority op., ¶ 65 (quoting *Brown v. Illinois,* 422 U.S. at 609 (Powell, J., concurring)). Here, police deliberately abandoned their well-grounded plan to seek a warrant, which all agree they had probable cause to obtain. "Until a valid warrant has issued, citizens are entitled to shield 'their persons, houses, papers, and effects' from the government's scrutiny. Exclusion of the evidence obtained by a warrantless search vindicates that entitlement." *Hudson v. Michigan,* 547 U.S. 586, 591 (2006). The majority analysis loses sight of the deterrence and judicial integrity goals it purports to effect through the exclusionary rule by providing no reason for police to obtain a warrant when evidence obtained without one is nevertheless admitted.

¶ 145. Police conduct need not be flagrant in order for the exclusionary rule to have a meaningful deterrent effect. Here, as the majority recognizes, police not only considered seeking a warrant but were planning to do so. Majority op., ¶ 8. As was true in *Robeles-Ortega,* the police decision to proceed without first obtaining a warrant as planned was, in a sense, "inexplicable."[18] Had police obtained a warrant, there would

---

[18] *United States v. Robeles-Ortega,* 348 F.3d 679, 680 (7th Cir. 2003) ("The actions taken by the DEA agents at that point in time are inexplicable. Rather than obtaining a search warrant based on that information, within two minutes of the [informant's] departure the agents forcibly entered the apartment by breaking down the door.").

have been no concern with entering the curtilage, no concern with the forced entry, and no need for multiple rounds of appellate litigation addressing detailed suppression doctrines. The State would not bear the burden of showing why the evidence obtained as a result of unconstitutional police conduct should nevertheless be admitted.

¶ 146. As the Seventh Circuit court of appeals has recognized, police who undertake a "knock and talk" procedure take on the risk that they may or may not thereby obtain admissible evidence.[19] Here, had the police obtained a search warrant, they would have been assured that any evidence thereby obtained would be lawful and admissible in court. When they chose to approach the house without a warrant, entered the curtilage, forced entry, and searched the upstairs and downstairs of Artic's house without ever seeking or obtaining a search warrant, police entered an arena where the law has maintained strong presumptions of constitutional protection and placed the burdens of

_____

[19] In *United States v. Collins,* 510 F.3d 697, 701 (7th Cir. 2007), the Seventh Circuit court of appeals explained that

> [T]here is no legal requirement of obtaining a warrant to knock on someone's door. . . . But the risk [police] take in proceeding . . . is that the emergency will not materialize—that the occupant of the house will calmly open the door and ask to see their warrant . . . . The further risk is that no one will answer the knock and the government will be unable to prove that the police knew the house was occupied.

Here, this is just what unfolded. Because the observations made from the rear of the house were unlawfully made, police were unable to prove, by evidence legally admissible in court, that the house was occupied. The majority nevertheless, and without explanation, relies on the observations unlawfully made by Detective Davila in its analysis of the case. *See* majority op., ¶¶ 10–11, 26 & n.5, 42, 99.

proof on the state. It is "axiomatic," after all, that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Richter,* 235 Wis. 2d at 540 (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 748 (1984)).

¶ 147. Because the majority has not candidly assessed the totality of the circumstances or properly allocated the burden of proof to the State and because the majority distorts the attenuation analysis, it has, in my view, incorrectly reached the conclusion that the evidence in this case was properly admitted and that the defendant therefore suffered no prejudice as a result of his counsel's failure to properly argue for its suppression. *See* majority op., ¶¶ 25–26. Although the majority concedes that Detective Davila's observations were unlawfully obtained, majority op., ¶ 26, no explanation is offered for why Artic was not prejudiced by her testimony both at the suppression hearing and at trial. The circuit court's crucial determination that Artic's own testimony at the suppression hearing was not credible relied explicitly on the unlawfully obtained Davila testimony. Nevertheless, the majority continues to rely on the credibility finding by the circuit court.[20]

¶ 148. For the reasons set forth, I dissent.

¶ 149. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[20] Neither the majority opinion nor the parties' briefs separately argue the issue of counsel's deficiency, and neither shall I.