COURT OF APPEALS
DECISION
DATED AND FILED

July 30, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      2023AP1029-CR

STATE OF WISCONSIN

Cir. Ct. No.  2021CF26

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

　　PLAINTIFF-RESPONDENT,

V.

TREVOR JAMES PLEMON,

　　DEFENDANT-APPELLANT.

---

　　　　　APPEAL from a judgment of the circuit court for Chippewa County: BENJAMIN J. LANE, Judge. *Affirmed*.

　　　　　Before Stark, P.J., Hruz and Gill, JJ.

　　　　　**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

　　　　　¶1　PER CURIAM. Trevor James Plemon appeals a judgment of conviction, entered following his no-contest plea, for homicide by use of a vehicle

with a detectable amount of a restricted controlled substance (Delta-9 THC) in the blood, as a second or subsequent offense. Plemon challenges the circuit court's denial of his motion to suppress, arguing that his consent to a blood draw was involuntary. We reject Plemon's arguments and affirm.

## BACKGROUND

¶2      Plemon hit a pedestrian with his work truck shortly before 6:40 p.m. on September 16, 2020. The pedestrian died from her injuries later that evening. At approximately 10:15 on the night of the accident, Plemon consented to a blood draw. Subsequent testing of his blood sample revealed the presence of both methamphetamine and Delta-9 THC. The State charged Plemon with homicide by use of a vehicle with a detectable amount of a restricted controlled substance (methamphetamine) in the blood and homicide by use of a vehicle with a detectable amount of a restricted controlled substance (Delta-9 THC) in the blood, both as second or subsequent offenses. The State also charged Plemon with possession of THC and possession of drug paraphernalia, based on items that were found in his belongings following the accident.

¶3      Plemon moved to suppress his blood test results, asserting that "there was no probable cause on which to extend his detention" and that "consent [for the blood draw] was not properly given[,] making it a warrantless and impermissible blood draw." The circuit court held a hearing on Plemon's motion, at which Deputy Jake Sperry and Patrol Sergeant Martin Folczyk of the Chippewa County Sheriff's Office testified, and various documents were admitted into evidence. The following facts are taken from the evidence introduced at the suppression hearing and from a police report that was entered into evidence at Plemon's preliminary hearing, which both parties cite in their appellate briefs. *See State v.*

*Gaines*, 197 Wis. 2d 102, 107 n.1, 539 N.W.2d 723 (Ct. App. 1995) ("When reviewing a suppression order, an appellate court is not limited to examination of the suppression hearing record. It may also examine … the evidence at the preliminary hearing." (citations omitted)).

¶4 Sperry arrived at the crash scene at approximately 6:40 p.m. and saw Plemon sitting on the back of his truck speaking with emergency services personnel. Sperry noted that Plemon was "shook up" and was "breathing heavily." When Sperry asked Plemon to explain what had happened, Plemon stated that the pedestrian was in the road when he drove around a curve, that the sun was in his eyes, and that he slammed on his brakes but could not stop his truck before hitting her. Sperry asked whether Plemon had any alcohol to drink that day, and Plemon responded in the negative.

¶5 Dispatch informed law enforcement that there had been two prior complaints regarding Plemon's vehicle earlier that day—one at 3:51 p.m. and one at 4:10 p.m. According to Folczyk, the callers reported "erratic driving behavior all over the roadway."

¶6 While speaking with Plemon, Sperry noticed a cell phone in Plemon's possession and seized it as evidence. Plemon then consented to a search of the phone.

¶7 Later, at approximately 7:44 p.m., Sperry asked Plemon whether he would consent to a blood draw. Plemon refused, stating he was "afraid of needles." At that point, Folczyk "explained to Plemon that it was certainly his right to refuse consent to the blood draw," but due to the severity of the victim's injuries, law enforcement "would explore other avenues and possibly apply for a search warrant to obtain a blood sample from him." Folczyk "re-iterated" that he

"was not trying to influence [Plemon's] decision but [was] simply telling him of [law enforcement's] obligations to conduct a thorough and complete investigation," and "Plemon stated he understood."

¶8      Plemon subsequently gave a state trooper consent to search his belongings, and the trooper located a small container of THC wax and a black smoking device inside a briefcase in Plemon's possession. Plemon admitted that the THC wax and smoking device belonged to him and that he was a daily user of THC. Plemon claimed, however, that he only smoked after work and had not used THC since 6:00 or 7:00 p.m. the previous day. Sperry asked Plemon for consent to search his vehicle, and Plemon gave his consent. Nothing of evidentiary value was found inside the vehicle.

¶9      Sperry then asked Plemon to provide a written statement, and Plemon agreed to do so. Plemon began writing the statement while sitting on the back of his truck, but he then stated that he was cold, so Sperry asked Plemon if he wanted to sit in Sperry's warm squad car. Plemon said that he wanted to do so and completed his statement in the squad car. While Plemon wrote out his statement, Sperry continued to investigate the crash.

¶10     After Plemon completed his statement, Sperry told Plemon that he would like to conduct standardized field sobriety tests to determine whether Plemon was impaired, and Plemon "stated that he was okay with that." Sperry told Plemon that he would prefer to conduct the tests at St. Joseph's Hospital, rather than on the side of the highway, and Plemon "said that was okay with him." Sperry then "placed [Plemon's] seat belt on him" and transported him to the hospital.

4

¶11     At the hospital, staff advised Sperry that he could conduct field sobriety tests in an enclosed ambulance bay. Sperry subsequently administered four field sobriety tests in the ambulance bay and observed one out of eight clues on one test and no clues on the other three tests.

¶12     After the field sobriety testing, Sperry asked Plemon "if he would like to have a seat in the rear passenger seat of [Sperry's] patrol vehicle," and Plemon "said he would." Sperry subsequently learned that the victim had died, and at approximately 10:05 p.m., he placed Plemon under arrest for operating a motor vehicle while intoxicated (OWI)—causing injury, as a second offense. At around 10:15 p.m., Sperry read Plemon the "Informing the Accused" form, and Plemon consented to a blood draw.

¶13     The circuit court denied Plemon's motion to suppress. The court found that Plemon consented to sitting in Sperry's squad car to stay warm while he wrote his statement and consented to the searches of his possessions and truck. The court concluded that after law enforcement found the THC wax and smoking device in Plemon's belongings, there was probable cause justifying Plemon's further detention.

¶14     Next, the circuit court found that Plemon consented to field sobriety tests and to leaving the accident scene with Sperry to perform those tests. The court concluded that during Plemon's transportation to the hospital, Plemon would not have felt free to leave and had therefore been seized. Nevertheless, the court concluded that the warrantless seizure was permissible because the officers had probable cause to believe that Plemon had committed a crime. The court then found that following his arrest at the hospital, Plemon consented to a blood draw.

Based on Plemon's consent, the court concluded that no warrant for the blood draw was required.

¶15    Plemon moved for reconsideration. He argued that because the THC found in his belongings provided "the reason to continue the investigation," "[a]ny consent for a blood draw after [his] seizure would not be valid as it was unrelated to simple possession of THC." Plemon further argued that, following his seizure, law enforcement "had ample time to seek a warrant" but chose not to do so. According to Plemon, under these circumstances, his consent to the blood draw was invalid.

¶16    The circuit court denied Plemon's motion for reconsideration. The court concluded that the officers had probable cause to arrest Plemon for operating a motor vehicle with a detectable amount of a restricted controlled substance in his blood at the time of his transport to the hospital because "when there is evidence of impaired driving when there are [controlled] substances at issue, … it's different than alcohol in that there's no level that you have to meet in order to be impaired. You are impaired simply by having information showing … substances that have been consumed." The court then found, once again, that Plemon had consented to a blood draw after he was seized by law enforcement. The court rejected Plemon's argument that his consent was invalid, noting that prior to the blood draw, law enforcement read Plemon the "Informing the Accused" form, which informed him of his right to refuse the blood draw. The court also found that the officers had not "pressured" Plemon to change his mind and consent to the blood draw.

¶17    After the circuit court denied Plemon's reconsideration motion, the parties reached a plea agreement. Plemon entered a no-contest plea to the charge

of homicide by use of a vehicle with a detectable amount of a restricted controlled substance (Delta-9 THC) in the blood, as a second or subsequent offense, and the remaining three charges were dismissed and read in.[1] Plemon now appeals, arguing that the court erred by denying his suppression motion. *See* WIS. STAT. § 808.03(3)(b) (2021-22) (stating that an order denying a suppression motion may be reviewed on appeal from a final judgment or order notwithstanding the defendant's entry of a guilty or no-contest plea).[2] Specifically, Plemon argues that his consent to the blood draw was not voluntary.

## DISCUSSION

¶18    When reviewing a circuit court's decision on a motion to suppress evidence, we apply a two-step standard of review. *State v. Roberson*, 2019 WI 102, ¶66, 389 Wis. 2d 190, 935 N.W.2d 813. "We first review the circuit court's findings of historical fact, which we uphold unless they are clearly erroneous. Next, we independently apply constitutional principles to the facts found, which presents a question of law." *Id.* (citations omitted).

¶19    Both the United States Constitution and the Wisconsin Constitution protect against "unreasonable searches and seizures." U.S. CONST. amend. IV; WIS. CONST. art. I, § 11. A blood draw constitutes a search, and warrantless searches are per se unreasonable, subject to several clearly delineated exceptions. *State v. Blackman*, 2017 WI 77, ¶53, 377 Wis. 2d 339, 898 N.W.2d 774. "One

---

[1] Pursuant to the plea agreement, Plemon also entered a no-contest plea to second-offense OWI in a separate case. That conviction is not before us in this appeal.

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

7

well-established exception to the warrant requirement is a search conducted pursuant to consent." ***State v. Artic***, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430.

¶20    "To determine if the consent exception is satisfied, we review, first, whether consent was given in fact by words, gestures, or conduct; and, second, whether the consent given was voluntary." ***Id.***, ¶30.   Here, the circuit court found—and Plemon does not dispute—that Plemon consented in fact to the blood draw.  The disputed issue on appeal is whether Plemon's consent was voluntary.

¶21    The State bears the burden to prove, by clear and convincing evidence, that a defendant's consent to a search was freely and voluntarily given.[3] ***Id.***, ¶32.  The defendant's consent must be "an essentially free and unconstrained choice," not "the product of duress or coercion, express or implied." ***Id.*** (citations omitted).  The voluntariness of a defendant's consent presents a mixed question of fact and law and requires us to consider "the totality of all the surrounding circumstances." ***Id.*** (citation omitted).  The following, nonexclusive factors are relevant to our analysis:

> (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade [the defendant] to consent; (2) whether the police threatened or physically intimidated the defendant or

---

[3] The State asserts that "[t]he clear and convincing evidence standard for showing consent to a search appears to have entered Wisconsin case[ ]law via ***Kelly v. State***, 75 Wis. 2d 303, 316, 249 N.W.2d 800 (1977)," which relied upon cases decided by the United States Court of Appeals for the Fifth Circuit.  The State argues, however, that the United States Supreme Court has overruled those Fifth Circuit cases.  Accordingly, the State asserts that it was required to prove that Plemon's consent to the blood draw was voluntary by only a preponderance of the evidence.  We need not address this issue because even applying the higher "clear and convincing evidence" standard, we conclude that the State met its burden to show that Plemon's consent was voluntary.

> "punished" [the defendant] by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he [or she] could refuse consent.

*Id.*, ¶33.

¶22 Applying these factors in the instant case, we conclude that Plemon voluntarily consented to the blood draw. First, there is no evidence that law enforcement used "deception, trickery, or misrepresentation" to obtain Plemon's consent. *See id.*

¶23 In arguing to the contrary, Plemon asserts that the officers were deceptive because they detained him for several hours but "did not reveal their suspicions to [him] or explain the situation regarding why they would not let him leave." We agree with the State, however, that "anyone in Plemon's position would have understood the officers' suspicions." Plemon had crashed his vehicle into a pedestrian, who suffered serious—and ultimately fatal—injuries. Shortly after arriving on the scene, Sperry asked Plemon whether he had any alcohol to drink that day. Later on, Sperry asked Plemon to consent to a blood draw. After Plemon refused, Folczyk explained that, due to the severity of the victim's injuries, law enforcement "would explore other avenues and possibly apply for a search warrant to obtain a blood sample from him." Law enforcement subsequently discovered THC and a smoking device in Plemon's belongings and questioned him about his THC use. Thereafter, Sperry asked Plemon whether he would consent to perform field sobriety tests to determine whether he was impaired. As the State aptly notes, under these circumstances, "anyone in

9

Plemon's position would [have understood] that the officers suspected that he had used an impairing substance before hitting the pedestrian with his truck, and that they were investigating to determine whether he had done so."

¶24    Turning to the second *Artic* factor, there is no evidence that the officers "threatened or physically intimidated" Plemon or "punished" him "by the deprivation of something like food or sleep." *See id.* Plemon argues that the officers' conduct was threatening or intimidating because they "prolong[ed] his detention in order to wear him down." He asserts that the officers were with him from approximately 6:40 p.m. to 10:20 p.m., and if they "had probable cause immediately after searching [his] belongings, … they could have arrested him after only a fraction of that time." Notably, however, Plemon cites no authority suggesting that the police must arrest a suspect as soon as there is probable cause to do so, rather than continuing to investigate.

¶25    Plemon also asserts that he "was restrained, [which is] a fact relevant to the assessment of" the second *Artic* factor. *See State v. Phillips*, 218 Wis. 2d 180, 199, 577 N.W.2d 794 (1998). Specifically, Plemon argues that he was seated in the back of Sperry's squad car "for some time at the scene," that he was "put back in the squad car" after he completed field sobriety testing, that the squad car's doors were locked and could not be opened from the inside, and that Sperry buckled Plemon's seat belt before transporting him to the hospital, which provides "further evidence of restraint."

¶26    We are not persuaded that the degree of restraint in this case supports a determination that Plemon's consent to the blood draw was involuntary. Plemon was not handcuffed at any point before consenting to the blood draw. Moreover, the circuit court found that Plemon consented to sitting in the squad car

to stay warm while he wrote his statement, and Plemon does not argue that the court's finding in that regard was clearly erroneous. In addition, Sperry's report states that following the field sobriety tests, Sperry asked Plemon "if he would like to have a seat in the rear passenger seat of [Sperry's] patrol vehicle," and Plemon "said he would." Plemon does not dispute that he consented to sitting in the squad car at that point. Although the squad car's doors may have been locked and incapable of being opened from inside the squad car,[4] Plemon cites no evidence showing that he ever asked to exit the squad car and was denied permission to do so. Furthermore, although Sperry buckled Plemon's seat belt before driving him to the hospital, as the State correctly notes, Wisconsin law requires a person to wear a seat belt while riding in a car. *See* WIS. STAT. § 347.48(2m)(d). We agree with the State that "[e]nsuring Plemon's safety while he was riding in the squad car after he consented to doing so is not restraint, much less restraint that somehow rendered his consent to a blood draw involuntary."

¶27    Plemon also argues that his removal from the accident scene to a different location is relevant to our analysis of the second *Artic* factor. *See Phillips*, 218 Wis. 2d at 200. He emphasizes that he was "driven more than 19 miles away from the scene (where his vehicle was) at high speeds for more than 20 minutes."[5] Plemon further argues that the "only reason" to transport him

---

[4] Plemon cites Sperry's report in support of his claim that the squad car's doors were locked and could not be opened from the inside. However, the report does not state whether the doors were locked or could be opened from inside the vehicle.

[5] While Plemon asserts that he was driven to the hospital at "high speeds," there is no evidence in the record regarding the speed at which Sperry drove while transporting Plemon to the hospital. At most, during the suppression hearing, defense counsel showed Sperry a printout from Google Maps, which showed that the trip from the accident scene to the hospital—primarily along United States Highway 53—was nineteen miles and would have taken twenty-one minutes. Sperry agreed that those estimates were "roughly" correct.

(continued)

to the hospital for field sobriety tests, rather than a closer location, "was to intimidate him into believing police were going to get his blood no matter what and he therefore needed to consent a blood draw."

¶28 These arguments ignore the circuit court's factual findings. The court found that it was "reasonable" to transport Plemon to a different location to perform field sobriety tests because the accident "occurred on a 90-degree corner on a state highway where it was a busy location, apparently, on a curve." Perhaps more importantly, the court also found that Plemon consented to leave the accident scene to perform field sobriety tests.[6] Under these circumstances, we do not view

During its oral ruling, the circuit court surmised that Sperry's vehicle would have been traveling at fifty-five miles per hour on the way to the hospital. We agree with the State, however, that it makes "no difference" that Sperry drove to the hospital "at highway speed." There is nothing inherently coercive about a police officer driving at a rate of fifty-five miles per hour on a highway while transporting a suspect to an alternative location, after obtaining the suspect's consent to go to that location. And, as the State notes, "if [Sperry] had driven more slowly, Plemon would have been in the squad car longer." Plemon's complaint that Sperry drove at "high speeds" is therefore inconsistent with his complaint that the officers needlessly prolonged his detention.

[6] In his reply brief, Plemon argues that while he agreed to go to another location to perform field sobriety tests, he never agreed to go to the hospital. However, Sperry's report expressly states:

> I informed [Plemon] that I would like to conduct standardized field sobriety testing on him to determine if he was impaired. He stated that he was okay with that. *I advised him that I would prefer to go to St. Joseph's Hospital to do the testing since it was a better environment than doing it on HWY 64. He said that was okay with him.*

(Emphasis added.) In addition, at the suppression hearing, Sperry testified that Plemon "consented to going somewhere else" for field sobriety testing, and Sperry told Plemon that they would be going to "St. Joseph's Hospital in Chippewa Falls." The record therefore fails to support Plemon's assertion that when Sperry asked him about going somewhere else for field sobriety testing, Plemon "probably thought [Sperry] meant going to a nearby quiet street or gas station," not to the "far away" hospital.

Plemon's removal from the scene and transportation to the hospital as particularly threatening or intimidating.

¶29     The third *Artic* factor requires us to consider "whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite." *Artic*, 327 Wis. 2d 392, ¶33. Plemon concedes that, in this case, there is "no evidence" that law enforcement "made overt threats or were openly intimidating" to him. He argues, however, that the officers engaged in "implicit" coercion by "clearly asserting their authority" over him. Specifically, Plemon notes that the officers: (1) seized his phone, leaving him unable to call anyone; (2) made it clear that he could not leave; (3) held him for an extended period of time without "providing information on his custody status"; (4) transported him from the accident scene to the hospital; (5) asked him to consent to a blood draw a second time, "even after they knew [he] had refused and was afraid of needles"; (6) took him to an enclosed ambulance bay for field sobriety testing "where he was alone with police and out of public view"; and (7) placed him back in the squad car after the field sobriety tests were completed.

¶30     We do not agree that these circumstances amount to implicit coercion. First, there is no evidence that Plemon objected when Sperry told Plemon that he was seizing Plemon's phone. In fact, Plemon gave Sperry consent to search the phone. Furthermore, while Plemon asserts that he was unable to call anyone, Sperry did not seize Plemon's phone until after Plemon's girlfriend had arrived at the accident scene and spoken to Plemon. Thus, Plemon was not completely isolated, despite Sperry's seizure of the phone.

¶31     In addition, while Plemon was with law enforcement for approximately three hours and forty minutes before consenting to the blood draw,

we do not perceive that delay as being inherently coercive under the facts of this case, especially given the severity of the incident under investigation. Moreover, while Plemon again complains that he was transported from the accident scene to the hospital for field sobriety tests, as noted above, he consented to that action. Additionally, we agree with the State that asking Plemon to consent to a blood draw a second time—following his arrest and after law enforcement learned that the victim had died—was not "unfairly threatening." Rather, it was a reasonable response by the officers to additional developments in their investigation.

¶32 As for Plemon's complaint that he was taken to an enclosed ambulance bay for field sobriety testing, the record shows that Sperry was directed to that location by hospital staff. Although Plemon asserts that it was "no doubt intimidating" to be alone with the police and out of public view in the ambulance bay, he cites no evidence in support of that assertion. It seems equally likely that a person in Plemon's position would have preferred to perform field sobriety tests in private, rather than in a more public location.

¶33 Finally, as discussed above, the record shows that after the field sobriety tests, Sperry asked Plemon "if he would like to have a seat in the rear passenger seat of [Sperry's] patrol vehicle," and Plemon "said he would." Again, we do not view this consensual action by Plemon as evidence of implicit coercion.

¶34 The fourth *Artic* factor—i.e., how Plemon responded to law enforcement's request for consent—also fails to support Plemon's claim that his consent was involuntary. *See id.* It is true that Plemon initially refused to consent to a blood draw, and our supreme court has stated that "[a]n initial refusal of a request to search will weigh against a finding of voluntariness." *See id.*, ¶56. However, the circuit court expressly found, on reconsideration, that following

14

Plemon's initial refusal, the officers did not "pressure[]" him to change his mind and consent to the blood draw. And, as the State aptly notes, "[I]t is hardly surprising that Plemon initially refused to give consent to a blood draw when he had not been arrested and faced no consequences for refusing but gave consent when he had been arrested and knew that he would lose his operating privilege if he refused."[7] We therefore agree that, under the circumstances of this case, Plemon's initial refusal to consent to a blood draw does not support a determination that his subsequent consent was involuntary.

¶35 Addressing the fifth *Artic* factor, Plemon asserts that his personal characteristics rendered his consent to the blood draw involuntary. *See id.*, ¶33. In particular, he asserts that he was "in an extremely vulnerable emotional condition at the time police asked for consent" because he "had just hit and killed a woman while driving home." In support of this assertion, Plemon cites Sperry's report, which noted that Plemon was "shook up" and "breathing heavily" at the accident scene. Plemon also notes that he was twenty-four years old at the time of the accident and had no criminal history, meaning that he was "no doubt extremely intimidated by his interactions with police." Plemon also asserts that he was "unfamiliar with the concept of a search, what was required for one to be performed legally, and his ability to refuse to consent."

¶36 We are not persuaded that Plemon's personal characteristics rendered his consent to the blood draw involuntary. First, while the record shows that Plemon was upset at the accident scene, there is no evidence to support

---

[7] Plemon does not attempt to argue that Sperry engaged in improper coercion by reading Plemon the "Informing the Accused" form and thereby informing him of the civil penalties that he faced if he refused to consent.

15

Plemon's claim that he continued to be in a fragile emotional state when he consented to a blood draw at the hospital three hours and forty minutes later.

¶37    Second, while Plemon emphasizes that he was only twenty-four years old at the time of the accident, the record shows that he had completed twelve years of schooling and had earned a high school equivalency diploma.  In *United States v. Mendenhall*, 446 U.S. 544, 558 (1980), the United States Supreme Court concluded that a defendant who was twenty-two years old and had an eleventh-grade education was "plainly capable of a knowing consent" to a search.

¶38    Third, although Plemon asserts that he had no criminal history, he concedes that he was "convicted of OWI-first" prior to the accident in this case. While first-offense OWI is not a crime in Wisconsin, it appears self-evident that Plemon would have had contact with law enforcement in connection with that offense.

¶39    Fourth, while Plemon claims that he did not understand the concept of a search or his ability to refuse consent, the record suggests otherwise. Specifically, the fact that Plemon consented to searches of his possessions and truck, but initially refused to consent to a blood draw, shows that he understood he could refuse to consent.

¶40    The sixth *Artic* factor directs us to consider whether law enforcement informed Plemon that he could refuse to consent.  *See Artic*, 327 Wis. 2d 392, ¶33.  The record shows that after Plemon's initial refusal, Folczyk informed Plemon that he had a right to refuse to consent to a blood draw.  Later on, Sperry read Plemon the "Informing the Accused" form, which similarly informed Plemon that he could choose not to consent.  Plemon points to no

16

evidence suggesting that he was incapable of understanding the information that the officers provided regarding his ability to refuse to consent.

¶41 Plemon emphasizes that although Folczyk told him that he could refuse to consent to a blood draw, Folczyk also stated that law enforcement "would explore other avenues and possibly apply for a search warrant to obtain a blood sample from him." Plemon asserts that this statement could be "seen as a form of intimidation—essentially telling [him] that he should do what police were asking because they would get him anyway." However, "[t]hreatening to obtain a search warrant does not vitiate consent if 'the expressed intention to obtain a warrant is genuine ... and not merely a pretext to induce submission.'" *Id.*, ¶41 (citation omitted). There is nothing in the record to suggest that Folczyk's statement about obtaining a warrant was not genuine and was merely a pretext to obtain Plemon's consent to a blood draw.

¶42 Having considered all six of the *Artic* factors, we conclude that the State met its burden to show that Plemon's consent was voluntary. Accordingly, the circuit court properly denied Plemon's suppression motion, and we affirm Plemon's judgment of conviction.

> *By the Court.*—Judgment affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.

17