COURT OF APPEALS
DECISION
DATED AND FILED

May 13, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2025AP1703**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023TR2823

**IN COURT OF APPEALS
DISTRICT II**

CITY OF MEQUON,

    PLAINTIFF-RESPONDENT,

V.

SCOTT SARVER LINDVALL,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Ozaukee County: STEVEN M. CAIN, Judge. *Affirmed*.

¶1 GROGAN, J.[1] Scott Sarver Lindvall appeals from a judgment of conviction entered following a court trial after which the circuit court found him guilty of Operating a Motor Vehicle with a Prohibited Alcohol Content (PAC)

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

contrary to WIS. STAT. § 346.63(1)(b) (2023-24) as a first offense.[2] On appeal, Lindvall specifically challenges the court's pre-trial order denying his motion seeking to suppress the blood test result obtained pursuant to WIS. STAT. § 343.305, Wisconsin's Implied Consent Law, on the ground that his consent to the blood draw was coerced and therefore involuntary and in violation of the Fourth Amendment.[3] This court concludes Lindvall's consent was not coerced and that he voluntarily consented. Because the circuit court did not err, this court affirms, albeit on alternate grounds.

## I. BACKGROUND

¶2 The following facts are generally undisputed. At around 9:30 p.m. on September 14, 2023, Lindvall was on his way home to Shorewood from a bourbon tasting event at the Ozaukee Country Club in Mequon when he failed to

---

[2] The Notice of Appeal, although properly identifying the Ozaukee County Circuit Court in the header, states that Lindvall "appeals from the Entry of Judgment of the Circuit Court for *Brown County*" and that Lindvall "was convicted of Operating a Motor Vehicle While Intoxicated – First Offense contrary to WIS. STAT. § 346.63(1)(a)." (Emphasis added.) Given that both the Judgment of Conviction and CCAP notes for this matter reflect a conviction for violating § 346.63(1)(b)—*not* § 346.63(1)(a)—this court assumes the references to § 346.63(1)(a) and the "Circuit Court for Brown County" in Lindvall's Notice of Appeal are typographical errors. "CCAP" is the acronym commonly used to refer to the Consolidated Court Automation Program, which "is a case management system provided by [the] Wisconsin Circuit Court Access program" that "provides public access online to reports of activity in Wisconsin circuit courts[.]" *State v. Bonds*, 2006 WI 83, ¶6, 292 Wis. 2d 344, 717 N.W.2d 133. Appellate courts may take judicial notice of CCAP records. *See* WIS. STAT. § 902.01; *see also* **State v. Aderemi**, 2023 WI App 8, ¶7 n.3, 406 Wis. 2d 132, 986 N.W.2d 306.

This court also notes that Lindvall, in a reply brief filed in the circuit court, criticized the City's counsel for obvious typographical errors in its briefing, going so far as to state that "Mr. Lindvall will assume that the City was using a 'canned brief' and simply engaged in a monumental proofreading error by referring to a motion that had presumably been filed in another of the City's cases" and that he "urges the City to pay closer attention to its work product[.]" The court trusts that all parties should take care to provide the court with accurate facts in the filings.

[3] U.S. CONST. amend. IV.

navigate a sharp curve in the road and crashed his motor vehicle through a tree line.[4] When City of Mequon police officers located Lindvall, his vehicle was approximately 100 feet off the road and had sustained significant damage, including the airbags having been deployed. According to City of Mequon Police Officer Brandy Campbell, when she approached Lindvall, he was "using his car for balance, and had red, glossy eyes." Her report also noted Lindvall "was unsteady on his feet, and was swaying from side to side." Lindvall admitted he had been at the bourbon tasting event, and when Officer Campbell questioned whether he thought he was in any condition to be driving, he responded to the effect of "in retrospect not so much."

¶3    Officer Campbell observed that Lindvall's nose appeared to be swollen and that he was bleeding from a laceration to the back of his head. Paramedics arrived on scene and transported Lindvall to the hospital. Officer Campbell did not conduct field sobriety tests on the scene due to Lindvall's injuries.

¶4    While at the hospital, Officer Campbell explained to Lindvall that she wished to conduct field sobriety tests given the circumstances of the accident and Lindvall's admission he had been drinking. Lindvall agreed. At the evidentiary hearing, Officer Campbell testified she asked Lindvall how he was feeling throughout the tests and explained the various tests she performed. For example, she conducted a modified horizontal gaze nystagmus (HGN) test with

---

[4] Some of the background facts come from Officer Campbell's body camera recording, which was submitted to the circuit court and is part of the appellate Record. This court has reviewed the portions of that recording submitted to the circuit court for its review. This court further notes that the parties generally do not dispute the underlying facts, but rather the application of the law to those facts.

Lindvall seated at the edge of the bed, as well as an alphabet test requiring Lindvall to recite the alphabet beginning with the letter D and ending at N. She reported observing "[a]ll six clues" and "vertical gaze nystagmus" on the HGN test, and although Lindvall correctly began with the letter D on the alphabet test, "he went all the way to X" before "he stopped and said he forgot which letter" to go to and then began again with D, reciting "all the way to Y" before saying "R" and then the letter "Z." Officer Campbell also asked Lindvall to count from 22 to 33, which he did correctly aside from beginning with the number 23, and she also conducted a counting test wherein Lindvall was to "count[] and touch[] his fingertips at the same time." According to Officer Campbell, Lindvall performed "[p]oorly" on the various tests, and she informed him that based on the tests and the totality of the circumstances, she was taking him into custody for operating while under the influence.

¶5     Officer Campbell thereafter read Lindvall the Informing the Accused Form (the Form), *see* WIS. STAT. § 343.305(4), and asked if he was willing to consent to a blood draw. Lindvall responded by requesting to speak to an attorney, and a brief conversation between Officer Campbell and Lindvall ensued.[5] First, Officer Campbell sought to clarify whether Lindvall's statement that he wished to speak to an attorney meant he was not willing to submit to the blood draw. Lindvall responded "Yes[,]" and Officer Campbell again sought clarification. After Lindvall confirmed he was refusing to consent to the blood draw, Officer Campbell stated:

---

[5] In its Response brief, the City provided a transcription of this conversation, which was captured on Officer Campbell's body camera. Lindvall does not dispute the accuracy of this transcription in his Reply brief, and as previously noted, this court has reviewed the body camera recording to ascertain its accuracy.

> Ok, so you have to, you, you have to you either submit to it or not, so, we can't wait for a lawyer or anything like that, we can't say anything that will convince you otherwise, understand that if you refuse then that is automatic revocation of your driver status, um … so … that's kinda, that's what they mean by saying that there's, um, other penalties that kinda go along with that. So, at this time, right now, are you willing to submit to a test of your blood?

Lindvall responded, "No." After a brief pause, Lindvall re-initiated the conversation, stating he did not "know anything about this but" that it "fe[lt] like [he] should talk to a lawyer first." Officer Campbell reiterated that doing so was not an option at that point and that he could speak to an attorney before going to court, and she again informed Lindvall he had two options: "So the option is either get blood taken, or not get blood taken right now." Another brief pause followed before Lindvall again re-engaged, stating "I don't know, I've heard, like, shitshows about this, um. I don't know."

¶6      As before, Officer Campbell reiterated that she "can't really sway [him] either direction" and again stated "there's penalties for refusing" and that "there's a time for all of that and a place but it's not right now." When Lindvall asked what she was saying, Officer Campbell again explained she "can't swing [him] in either decision, [he] ha[s] to make the decision on [his] own [of his] own free will if [he]'d like to submit to the" blood test. When Lindvall asked "[w]hat else" she could tell him, Officer Campbell said she could not tell him anything else "[b]ecause anything else is gonna sound like [she's] kinda forcing [him] to do it." She reiterated the same again after Lindvall stated he understood the "gist" of what she was saying was "don't fuck with this," clarifying:

> That's not what I'm saying, I'm saying, I can't, like, I can't give you further info like, well if you don't then this happens, because that makes it sound like I'm forcing you to choose one direction or the other and I can't do that. All

> I can tell you is give you the facts, these are the facts of it.
> This is where we're at in the process right now[.]

Lindvall asked Officer Campbell to repeat the facts and she obliged, explaining he was under arrest, that the police department wished to test his blood to determine his blood alcohol concentration (BAC), and that he had two options: "[Y]ou can either at this point in the process, consent to us having the hospital staff draw your blood, that we're going to test to see your alcohol level, or say that you're not going to do that, that you refuse to have that testing done." Lindvall simply responded "Okay," and when Officer Campbell asked if that meant he was willing to consent to the blood draw, Lindvall said "Yes."[6]

¶7 After receiving the results of Lindvall's blood test, which showed a 0.178 BAC, the City issued Lindvall a citation for operating with a prohibited alcohol content contrary to city ordinance 82-1[7] and WIS. STAT. § 346.63(1)(b) as

---

[6] In his appellate brief, Lindvall states that at the suppression hearing, "Officer Campbell conceded" that after reading Lindvall the Form, "*the last thing* she told Mr. Lindvall prior to him giving his consent to a blood test was that 'if he refused, his license would be revoked *automatically.*'" (First emphasis added.) This court has reviewed the Record and concludes this statement does not accurately represent the interaction between Officer Campbell and Lindvall. While it is true that Officer Campbell responded "Correct" when Lindvall's counsel asked her whether "ultimately … the last thing that [she] told [Lindvall] before he gave [her] the only yes that [she] got from him" regarding consent was that "if he refused his license would be revoked automatically[,]" the body camera exchange in the Record does not reflect the same. Specifically, although the body camera recording reflects that Officer Campbell did state that if Lindvall refused the blood draw, "then that is automatic revocation of [his] driver status," the statement about "automatic revocation" occurred near the *beginning* of that exchange—*not* at the end, and *not* immediately prior to Lindvall stating "yes" in response to Officer Campbell asking whether Lindvall would consent following her responses to Lindvall's multiple questions.

This court's review of the Record also revealed that although Lindvall, in his appellate brief-in-chief, only mentions the modified HGN test, Officer Campbell in fact conducted multiple other field sobriety tests. Parties should always present the court with a complete and accurate factual account.

[7] MEQUON, WIS., CODE § 82-1 (1996).

6

a first offense. Prior to trial, Lindvall filed multiple motions seeking to suppress the BAC results, only one of which—his motion asserting his consent to the blood draw had been coerced—is relevant on appeal.[8] In that motion, Lindvall asserted his consent was coerced, and therefore involuntary, for Fourth Amendment purposes. Generally speaking, he argued his consent was coerced because Officer Campbell's statement that license revocation would be "automatic" if he refused to consent was incorrect both because revocation is not "automatic" under the Implied Consent Law unless an individual fails to timely request a refusal hearing, and because a driver may ultimately prevail at a requested revocation hearing. Accordingly, he said, the "misstatement of the law sends a clear message to Mr. Lindvall that if he wanted to maintain his operating privilege beyond the day of his arrest, he had no choice but to consent to a test rather than exercising his right to refuse the same."

¶8 The City disagreed with Lindvall's contention that Officer Campbell had provided incorrect information because, it said, WIS. STAT. § 343.305(4), which sets forth the language utilized in the Form, requires only that an individual

---

[8] Lindvall also sought suppression on the grounds that Officer Campbell violated the Fourth Amendment's reasonableness requirement in regard to her discussion with medical personnel as to whether Lindvall would receive fluids at the hospital and that the field sobriety tests were unreliable under the circumstances, and therefore there was no probable cause to arrest and seek consent for the blood draw. Additionally, Lindvall filed a motion seeking a declaration that WIS. STAT. § 343.305 is unconstitutional under the unconstitutional conditions doctrine.

Lindvall does not raise any of these arguments on appeal. Those arguments are therefore deemed abandoned, and this court will not address them further. *See, e.g.*, ***A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 491-93, 588 N.W.2d 285 (Ct. App. 1998) (issue raised in the circuit court but not argued on appeal is deemed abandoned); ***State v. Pettit***, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (appellate courts need not address undeveloped arguments). Moreover, we recently rejected an essentially identical constitutional challenge to WIS. STAT. § 343.305 in ***County of Trempealeau v. Stenberg***, No. 2024AP281, slip op. recommended for publication (WI App Apr. 21, 2026).

be informed that his "operating privilege will be revoked" for refusing to consent to a requested test pursuant to the Informed Consent Law. According to the City, this was sufficient to satisfy the test set forth in *County of Ozaukee v. Quelle*, 198 Wis. 2d 269, 280, 542 N.W.2d 196 (Ct. App. 1995), *abrogated on other grounds by* ***Washburn County v. Smith***, 2008 WI 23, ¶64, 308 Wis. 2d 65, 746 N.W.2d 243. The City also pointed to *County of Dunn v. Cormican*, No. 2020AP1895, unpublished slip op. (WI App Feb. 7, 2023),[9] a case in which we recently rejected an argument similar to Lindvall's regarding the word "automatic" in the context of license revocation under the Implied Consent Law.

¶9      In April 2024, the circuit court held a hearing to hear the parties' arguments and take Officer Campbell's testimony. The court held an additional hearing in July 2024 at which time it denied Lindvall's motion.[10] After recounting Officer Campbell's testimony—particularly noting her descriptions of Lindvall at the scene, Lindvall's admission he had been at a bourbon tasting, the results of the modified field sobriety tests, and the officer's statement that license revocation would be "automatic" if Lindvall refused—the court, turning to both *Quelle* and *Cormican*, concluded use of the word "automatic" was not "necessarily misleading." It also noted there was "a void of evidence" in regard to *Quelle*'s third prong—that being whether the statement that revocation is automatic was a

---

[9] This case may be cited for its persuasive value pursuant to WIS. STAT. RULE 809.23(3)(b).

[10] In addition to denying Lindvall's suppression motions, the circuit court also granted the City's request to subpoena Lindvall's medical records from the hospital to obtain the BAC results of the hospital's non-evidentiary blood draw it had taken during the course of treatment immediately following Lindvall's accident. Those records reflect a BAC of 0.210, and the court granted the City's motion in limine seeking an order that the hospital results were admissible—a ruling Lindvall does not challenge on appeal.

"causal connection" as to Lindvall's decision to consent. Accordingly, the court concluded there was no ***Quelle*** violation, and in reaching this decision, it did not reference the Fourth Amendment.

¶10   The matter ultimately proceeded to a court trial in July 2025, and the circuit court found Lindvall guilty of operating a motor vehicle with a prohibited alcohol concentration as a first offense. Lindvall appeals.

## II. STANDARD OF REVIEW

¶11   When reviewing a circuit court's decision on a suppression motion, this court will uphold the circuit court's factual findings unless those findings are clearly erroneous. ***State v. Scull***, 2015 WI 22, ¶16, 361 Wis. 2d 288, 862 N.W.2d 562. The application of constitutional principles to those facts, however, is a question of law this court reviews de novo. ***Id.***; *see also* ***State v. Blackman***, 2017 WI 77, ¶25, 377 Wis. 2d 339, 898 N.W.2d 774.

## III. DISCUSSION

¶12   The primary issue on appeal is whether the circuit court erred in denying Lindvall's motion seeking suppression of the BAC evidence obtained as a result of the blood draw. The answer depends upon whether Lindvall voluntarily consented to having his blood drawn—a question which, in this case, turns largely (although not exclusively) on whether Officer Campbell's statement regarding "automatic" revocation was misleading.

¶13   Lindvall frames the issue as implicating the Fourth Amendment, contending his consent was coerced rather than voluntary because Officer Campbell, he says, misrepresented the license revocation process under the Implied Consent Law. In doing so, he asserts the circuit court erred in failing to

engage in a Fourth Amendment analysis and instead incorrectly—and problematically—considered only whether Lindvall was entitled to relief under *Quelle*.

¶14 Lindvall first cites *State v. Forrett*, 2022 WI 37, 401 Wis. 2d 678, 974 N.W.2d 422, and *State v. Brar*, 2017 WI 73, 376 Wis. 2d 685, 898 N.W.2d 499, for the proposition that the Fourth Amendment applies in the Implied Consent Law context and that he therefore had a right to refuse the requested blood test and accept the consequences arising therefrom. He also argues the City failed to establish by clear and convincing evidence that he had voluntarily consented to the warrantless blood draw. *See State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998).

¶15 According to Lindvall, his consent was not voluntary because it was the product of improper coercion stemming from what he says was misleading information and that his consent was merely "acquiescence to a claim of lawful authority." *See Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968). He further contends the totality of the circumstances factors set forth in *State v. Artic*, 2010 WI 83, ¶33, 327 Wis. 2d 392, 786 N.W.2d 430, support his position. This is so, he says, because our supreme court in *Blackman*, which considered whether the driver's consent to a blood draw was coerced, focused its totality of the circumstances discussion largely on its conclusion that law enforcement there had misrepresented information regarding license revocation to Blackman. *See Blackman*, 377 Wis. 2d 339, ¶¶2, 60. Lindvall says his case is "very much like *Blackman* in several aspects[,]" including that this was his first offense, he "remained cooperative," Officer Campbell was not "physically intimidating," and because Officer Campbell's statement that license revocation would be

10

"automatic" "if he refused a blood test is tantamount to the same type of coercion derided by the ***Blackman*** court[.]"

¶16 Finally, Lindvall faults the circuit court for addressing his suppression motion under ***Quelle*** rather than the Fourth Amendment, stating its "reliance on ***Quelle*** was … misplaced because at the time ***Quelle*** was decided, no 'constitutional right to refuse' testing existed." Lindvall further argues the court erred in relying on ***Cormican***, which he asserts is distinguishable, because there "the defendant admitted that he 'understood that [he] had a decision to make' even in light of the statements made by the arresting officer." *See **Cormican***, No. 2020AP1895, ¶9 (alteration in original).

¶17 In contrast, the City primarily addresses the suppression issue in the context of whether Officer Campbell substantially complied in regard to her reading of the Form, asserting "substantial reliance" requires that Lindvall be "inform[ed] … of the possible sanctions resulting from his taking or refusing to take the test." *See **State v. Sutton***, 177 Wis. 2d 709, 714, 503 N.W.2d 326 (Ct. App. 1993); *see also **Smith***, 308 Wis. 2d 65, ¶62 n.52. Noting Lindvall does not allege an error in regard to Officer Campbell's reading of the Form, the City contends the challenged statement—that license revocation would be "automatic" if Lindvall refused the blood draw—amounts to an example of an officer providing additional information and that ***Quelle***'s three-prong analysis applies.

¶18 To that end, the City argues this court should follow ***Cormican***, which applied the ***Quelle*** analysis. ***Cormican***, it says, is on point for its persuasive value because there the ***Cormican*** court concluded a similar statement about automatic license revocation following a refusal was not misleading, and Cormican therefore could not satisfy ***Quelle***'s three-prong analysis. *See*

*Cormican*, No. 2020AP1895, ¶¶16-18. Thus, it argues, this court should conclude both that Officer Campbell's statement substantially complied with the Implied Consent Law's requirements and was therefore not misleading, as well as that Lindvall failed to carry his burden of establishing any alleged misconduct impacted his decision under *Quelle*'s third prong.

¶19 The City also asserts that "Lindvall oversells the single word choice of 'automatically' in the broader setting of the three-minute exchange" with Officer Campbell and points to the multiple instances in which Officer Campbell informed Lindvall she could not say anything to sway or force his decision and that whether or not to consent was his choice. Similarly, the City challenges Lindvall's reliance on *Blackman*, saying that case is distinguishable because the reason the officer's statement there was coercive was because license revocation did not apply to Blackman at all whereas here, revocation for refusing to consent *did* apply to Lindvall. *See Blackman*, 377 Wis. 2d 339, ¶44. Finally, the City contends that even if this court agrees with Lindvall, any error in failing to suppress the results of the City's BAC test was harmless—assuming the harmless error analysis applies in a non-criminal traffic prosecution—because it had also obtained the results of the hospital's untainted blood test, which had been taken prior to the City's blood draw and showed an even higher BAC level.

¶20 In reply, Lindvall challenges the City's framing of the issue as whether Officer Campbell substantially complied with the Implied Consent Law and reaffirms his challenge is premised on a Fourth Amendment violation. He also seeks to distinguish *Cormican* on the basis that unlike in that case, there is no evidence in the Record here that he understood he had to make a choice between consenting and not consenting. Finally, in response to the City's contention that the harmless error analysis applies if an error occurred, Lindvall states he "is at a

12

significant disadvantage … because the plethora of facts upon which he would rely to demonstrate that this matter is defensible are not a part of this record[,]" which he seems to suggest is the result of this matter being an "appeal … in a civil case" in which "the court trial was a *pro forma* matter employed to preserve [his] challenge." He also says the harmless error test would fail because the remaining circumstances—such as the results of the field sobriety tests in light of their modifications and his head injury—"are suspect."

¶21 It is clear the parties dispute the framework upon which this court should address the issue Lindvall raises. However, regardless of the rubric applied in this matter, the result is the same: the circuit court did not err in denying Lindvall's suppression motion because the allegedly misleading statement was not actually misleading and was neither coercive under the totality of the circumstances for purposes of the Fourth Amendment nor misleading under the three-prong *Quelle* analysis.

¶22 The Fourth Amendment, along with article I, section 11 of the Wisconsin Constitution, prohibits unreasonable searches and seizures. U.S. CONST. amend. IV; WIS. CONST. art. I, § 11. "This court ordinarily construes the protections of these provisions coextensively." *Artic*, 327 Wis. 2d 392, ¶28. A warrantless search is "per se unreasonable"; however, "a search conducted pursuant to consent" is a "well-established exception to the warrant requirement[.]" *Id.*, ¶29. "To determine if the consent exception is satisfied, we review, first, whether consent was given in fact by words, gestures, or conduct; and, second, whether the consent given was voluntary." *Id.*, ¶30; *see also Phillips*, 218 Wis. 2d at 196-97. "[W]hether consent was given in fact is a question of historical fact." *Artic*, 327 Wis. 2d 392, ¶30. This court will "uphold a finding of consent in fact if it is not contrary to the great weight and clear

preponderance of the evidence." *Id.* "The State bears the burden of proving that consent was given freely and voluntarily," which requires "clear and convincing evidence[.]" *Id.*, ¶32. "The determination of 'voluntariness' is a mixed question of fact and law based on an evaluation of 'the totality of all the surrounding circumstances.'" *Id.* (citation omitted). "Consent is not voluntary if the state proves 'no more than acquiescence to a claim of lawful authority.'" *Id.* (citation omitted).

¶23    Courts look to the totality of the circumstances—such as "the circumstances surrounding the consent and the characteristics of the defendant"— when determining whether consent was voluntary, and "no single factor controls." *Id.*, ¶33. The "non-exclusive factors" courts are to consider when "determin[ing] whether consent was given voluntarily" include:

> (1) [W]hether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

*Id.* (citing *Phillips*, 218 Wis. 2d at 198-203).

¶24    Lindvall does not allege an absence of consent in fact, and even if he did, the Record would clearly belie such proposition given that Lindvall

ultimately, when asked if he would consent, unequivocally responded, "Yes."[11] Accordingly, the focus turns to whether Lindvall's consent in fact was voluntary. Whether Lindvall voluntarily consented to the warrantless blood draw primarily (although not exclusively) turns on whether Officer Campbell's statement regarding "automatic revocation" was coercive—in other words, whether it misstated or misrepresented the Implied Consent Law. This requires consideration of cases that have considered what the Implied Consent Law requires, including as it relates to an officer's recitation of the Form.

¶25 As relevant, Wisconsin's Implied Consent Law provides that any person who drives or operates a motor vehicle on Wisconsin's public highways:

> is deemed to have given consent to one or more tests of his or her breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol, controlled substances, controlled substance analogs or other drugs, or any combination of alcohol, controlled substance analogs and other drugs, when requested to do so by a law enforcement officer[.]

WIS. STAT. § 343.305(2). "Every driver in Wisconsin impliedly consents to take a chemical test for blood alcohol content[,]" although a driver may revoke that implied consent. *Quelle*, 198 Wis. 2d at 277; *see also **Brar***, 376 Wis. 2d 685, ¶39. The Form, which incorporates the language set forth in § 343.305(4), informs a driver of this choice. *See **Quelle***, 198 Wis. 2d at 277-78. As relevant, that language provides:

> You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the

---

[11] The circuit court did not make a specific finding regarding whether Lindvall consented in fact as it pertains to the Fourth Amendment analysis.

15

operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicated beverage.

This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. *If you refuse* to take any test that this agency requests, *your operating privilege will be revoked* and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.

Sec. 343.305(4) (emphases added).

¶26  Although ***Cormican*** is not binding on this court, its recent analysis of nearly identical challenged language in regard to revocation being "automatic" upon refusal is persuasive, and this court agrees with its reasoning. As the ***Cormican*** court noted, the "Form's statement that a person's operating privilege 'will be revoked' if the person refuses to take a requested test conveys the same meaning as [the officer's] subsequent statement … that the state would 'automatically' take away Cormican's operating privilege if he refused to consent to a blood test." ***Cormican***, No. 2020AP1895, ¶16. Both statements—the statutory language and the Form—convey the same information: "that if an individual refuses a requested test, the revocation of his or her operating privilege will necessarily occur." ***Id.*** Thus, the officer's statement to Cormican that a refusal would result in automatic revocation "did not go beyond the information" WIS. STAT. § 343.305(4) requires, and the statement was therefore not misleading. ***Cormican***, No. 2020AP1895, ¶16. The same reasoning applies here.

¶27 Lindvall also contends Officer Campbell's statement that revocation would be "automatic" was misleading because in practice, revocation is "automatic" only where an individual fails to request a refusal hearing and that if an individual *does* request a refusal hearing, that individual may ultimately prevail and *not* have his license revoked at all.[12] The ***Cormican*** court rejected a similar argument, and this court again agrees with its reasoning and analysis. *See **id.***, ¶¶17-18. As the ***Cormican*** court explained, concluding Officer Campbell's comment here—that revocation would be "automatic" if Lindvall refused—was misleading would require this court to *also* conclude WIS. STAT. § 343.305(4) itself is likewise "misleading because it fails to inform a person that his … operating privilege may not be revoked if the person requests, and prevails at, a refusal hearing." *See **Cormican***, No. 2020AP1895, ¶18. This court sees no reason to depart from ***Cormican****'s* rationale on this point.

¶28 Having established Officer Campbell's statement regarding "automatic" revocation following a refusal was an accurate statement of the law and therefore not misleading, this court readily concludes Lindvall's consent was voluntary under the totality of the circumstances for Fourth Amendment purposes. First, because Officer Campbell's statement was an accurate statement of the law, that statement clearly cannot amount to "deception, trickery, or misrepresentation"—the primary basis upon which Lindvall bases his argument. *See **Artic***, 327 Wis. 2d 392, ¶33; *see also **Cormican***, No. 2020AP1895, ¶28. Next, in attempting to draw parallels between his case and ***Blackman***, Lindvall

---

[12] At times it appears that Lindvall, in making this argument, conflates "automatic" with "instant" or "instantaneous." To the extent he does so, that does not alter the analysis as those words are not inherently interchangeable in this context.

concedes "Officer Campbell was not physically intimidating" and that he "remained cooperative[.]" *See Artic*, 327 Wis. 2d 392, ¶33. Thus, these factors counsel in favor of voluntariness.

¶29    In regard to how Lindvall responded to the request, it is clear he was initially uncertain and that he wavered as to whether or not to consent. However, after initially refusing, Lindvall himself re-engaged with Officer Campbell after a brief pause to ask additional questions, and Officer Campbell clearly and unequivocally informed him—multiple times—that she could only provide him with the facts, that *he* had to choose between consenting and not consenting, and that she could not provide additional information because it would appear as though she was attempting to force him to consent or sway his decision. Officer Campbell's repeated clarification that Lindvall himself had to choose between two options also undermines Lindvall's attempt to distinguish his case from *Cormican* to the extent he suggests that he, unlike Cormican, "did not understand" he needed to make a decision, *see Cormican*, No. 2020AP1895, ¶24, and it also confirms he was informed "that he could refuse consent[,]" *see Artic*, 327 Wis. 2d 392, ¶33. As to Lindvall's "age, intelligence, education, physical and emotional condition, and prior experience with the police[,]" *id.*, Lindvall did not have any prior OWI or operating with a PAC convictions, he had sustained a head laceration in the accident, and Officer Campbell's body camera reveals he was visibly upset.

¶30    Taking these factors into consideration as a whole, this court is satisfied that Lindvall voluntarily consented to the blood draw: there was no misrepresentation, he was not physically threatened, he was cooperative, and he was informed multiple times that he could refuse consent and that the decision was his and his alone. Although he did waiver initially as to his decision, he ultimately

consented—and he did so after Officer Campbell repeatedly clarified she could not sway him or force him one way or the other.

¶31    Lindvall's attempts to distinguish his circumstances from those in *Cormican* and to draw parallels between his circumstances and those in *Blackman* are unavailing.  As noted, the language at issue in *Cormican* was nearly identical, and this court has already rejected Lindvall's contention that he, unlike Cormican, did not understand that whether or not to consent was *his* decision.  *See Cormican*, No. 2020AP1895, ¶24.  And, the similarities here to *Blackman*—including this being Lindvall's first offense, Lindvall remaining cooperative, and Officer Campbell not being physically intimidating—do not overcome the crucial distinguishing factor that the information given to Blackman was inaccurate because Blackman was not subject to the revocation provision at all.  *See Blackman*, 377 Wis. 2d 339, ¶¶5, 60-66.  Here, Lindvall *was* subject to the revocation penalty, and he did *not* receive inaccurate or misleading information.  His attempt to analogize his case to *Blackman* fails.

¶32    As a final note, the conclusion that Officer Campbell's statement was not misleading for purposes of the Fourth Amendment analysis likewise leads to the conclusion that Lindvall is not entitled to relief under *Quelle*, either, which formed the basis of the circuit court's denial of Lindvall's suppression motion.  Pursuant to *Quelle*, which addressed the adequacy of the information provided regarding the Implied Consent Law, a defendant must establish the following in order to obtain relief: (1) that an officer failed to meet "or exceeded his or her duty under [WIS. STAT.] §§ 343.305(4) and 343.305(4m) to provide information to the accused driver"; (2) "the lack or oversupply of information" was misleading; and (3) that "the failure to properly inform the driver affected his or her ability to make the choice about chemical testing[.]" *Quelle*, 198 Wis. 2d at 273, 280.  Here, the

only potentially misleading information Lindvall points to is Officer Campbell's statement that revocation would be "automatic" if he refused the requested blood draw, and because this court has already determined this statement was not misleading, Lindvall cannot establish the three *Quelle* factors.  *See id.*; *see also Cormican*, No. 2020AP1895, ¶25.

¶33    In summary, this court concludes the challenged statement—that license revocation would be automatic if Lindvall failed to consent to the requested blood draw—was not misleading and that based on the totality of the circumstances, Lindvall voluntarily consented for Fourth Amendment purposes. Accordingly, this court affirms the circuit court's denial of Lindvall's suppression motion, albeit primarily on alternate grounds.[13]

*By the Court.*—Judgment affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[13] Because the circuit court did not err, it is unnecessary to address the City's arguments regarding harmless error.